Lois E. **WREN**, Plaintiff-Appellee,

v.

W. Nyles **SPURLOCK**,
Defendant-Appellant,

**Hugh Simmons and Carbon County
School District Number One,
Defendants.**

No. 83–2446.

United States Court of Appeals,
Tenth Circuit.

Aug. 11, 1986.

Theodore S. Halaby (Ronald M. Sandgrund and Cynthia M. Mardian with him on briefs), of Halaby & McCrea, Denver, Colo., for defendant-appellant.

Michael H. Gottesman (Robert M. Weinberg, of Bredhoff & Kaiser, Washington, D.C., and Patrick Hacker, Cheyenne, Wyo., with him on briefs), for plaintiff-appellee.

Before McKAY, McWILLIAMS, and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

This appeal is from a judgment for plaintiff in a case arising under 42 U.S.C. § 1983. Defendant W. Nyles Spurlock, a public school principal, challenges a jury award of $113,000 compensatory and $7,500 punitive damages to plaintiff Lois E. Wren, a teacher who contended at trial that Spurlock harassed her in retaliation for her exercise of First Amendment rights.

Spurlock alleges that the trial court committed several errors in the conduct of the trial: (1) it should have granted a defense motion for directed verdict on at least one of three issues; (2) it incorrectly handled one witness's comment labeling Spurlock a "sociopath"; (3) it submitted to the jury a special interrogatory that was compound and confusing; and (4) it made several errors in instructing the jury. Additionally Spurlock argues that the compensatory and punitive damage awards were excessive and that he was entitled to a setoff of settlement payments made to Wren by former codefendants, because Wren's injury was indivisible. We affirm.

I

Spurlock and Wren worked together for several years at the only public school in

Baggs, Wyoming, a community of approximately 600. The history of their relationship is a rocky one. For several years before Wren filed her first administrative grievance against Spurlock in October 1979, he had alleged that she allowed her health and other personal concerns to interfere with her duties, and had not followed his instructions on school policies. They had clashed over, among other things, science fair regulations, Wren's sponsorship of the yearbook, and inventory and ordering methods. Yet Spurlock characterized their differences before 1979 as minor, and he recommended that Wren's teaching contract be renewed every year from her return to full-time teaching in 1974 until after she called for the Wyoming Education Association (WEA) to investigate Spurlock in 1980.

Wren's first grievance filed under the school district's published procedure alleged that Spurlock harassed and intimidated her, and hampered her classroom performance. After a meeting between Spurlock and Wren and an investigation by the school superintendent, the school district board of trustees held a December 1979 hearing and directed both parties to make an "extra effort" to mend their personality conflict. In addition, Wren was told specifically to follow Spurlock's directives and he was told to make sure such directives were clear and enforced equally. Wren and Spurlock both testified that their relationship improved for a few months after the grievance.

By the end of the 1979–80 school year, however, the tension had returned. In April 1980, Wren's name appeared with those of nine other teachers on a letter listing thirty-five separate issues and seeking a WEA investigation of Spurlock's performance. At this point and shortly thereafter, numerous witnesses for both sides testified, there was dissension on the Baggs faculty and widespread community concern over the school. Several teachers testified that Spurlock's evaluations of them became more negative and his enforcement of school rules regarding them more restrictive after they assisted Wren

with her first grievance or signed the WEA letter. One of these teachers and Wren were suspended for approximately half a day with pay on May 14, 1980, the day after the district teachers' association endorsed the call for the WEA investigation. Spurlock and the superintendent denied that they had known of the association action before the suspensions.

It is undisputed, however, that the friction between Wren and Spurlock increased during the following school year, during which Spurlock was reprimanded as a result of the WEA investigation. The continuing dispute led to Wren's second administrative grievance and Spurlock's first recommendation that Wren's contract not be renewed. The school board rejected Spurlock's suggestion and renewed Wren's contract in March 1981, voting only to take "strong action" to discipline her. Wren's second grievance was closed later for an alleged failure to comply with district time limits.

Wren then requested a leave of absence upon the recommendation of her psychiatrist, which was granted without pay or fringe benefits. The board denied her request for an extension of the leave but never took any other formal action on her status after her refusal to return to work.

During the second week of trial, Wren executed a $125,000 settlement agreement with Spurlock's codefendants, the school district and the superintendent, who were then dismissed from the case. Spurlock did not seek a mistrial but has argued repeatedly that he is entitled to a setoff of the damage award in the amount of Wren's settlement with the district and superintendent.

II

Spurlock's first argument—that he was entitled to a directed verdict—can survive only if all the inferences to be drawn from the evidence are so patently in his favor that reasonable persons could not differ on the conclusions to be drawn. *Hidalgo Properties, Inc. v. Wachovia Mortgage*

*Co.*, 617 F.2d 196, 198 (10th Cir.1980). In other words, "[t]he standard of review in assessing whether a verdict should have been directed is the same standard applied by the trial court in passing on a motion for directed verdict initially, *i.e.*, whether the evidence is sufficient to create an issue for the jury." *Motive Parts Warehouse v. Facet Enterprises*, 774 F.2d 380, 385 (10th Cir.1985). Further, we must view the evidence in the light most favorable to Wren, the non-moving party. *Martin v. Unit Rig & Equipment Co., Inc.*, 715 F.2d 1434, 1438 (10th Cir.1983).

Spurlock contends that Wren's proof was inadequate to meet even this minimal standard in at least one of three respects. First, she failed to show that her speech was related to matters of public concern, as required by *Connick v. Meyers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689–90, 75 L.Ed.2d 708 (1983). Second, even if Wren's activities did touch on matters of public concern, she failed to show that her rights outweigh the state's legitimate interest in promoting efficiency of service under *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). And, third, Wren failed to show that Spurlock's detrimental treatment was motivated by her First Amendment activities.

Under *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the plaintiff in a retaliation case such as this must show that (1) the speech was constitutionally protected, i.e., the speech related to matters of public concern *and* the speaker's rights outweighed the state's right to control its employees, and (2) the speech was a substantial or the motivating factor in the state's detrimental action. *Id.* at 287, 97 S.Ct. 576; *accord Saye v. St. Vrain School District RE–1J*, 785 F.2d 862, 865–66 (10th Cir.1986); *Ferrara v. Mills*, 781 F.2d 1508, 1512 (11th Cir.1986); *Knapp v. Whitaker*,

757 F.2d 827, 845 (7th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985).

The first element, including both the public concern and balancing issues, raises a question of law. *Connick*, 461 U.S. at 148 n. 7, 150 n. 10, 103 S.Ct. at 1690 n. 7, 1692 n. 10; *Saye*, 785 F.2d at 865; *Ferrara*, 781 F.2d at 1515; *Roberts v. Van Buren Public Schools*, 773 F.2d 949, 954 (8th Cir. 1985); *Knapp*, 757 F.2d at 839; *Anderson v. Central Point School District*, 746 F.2d 505, 507 (9th Cir.1984); *Czurlanis v. Albanese*, 721 F.2d 98, 102–07 (3d Cir.1983); *Bickel v. Burkhart*, 632 F.2d 1251, 1256 (5th Cir.1980); *cf. Brasslett v. Cota*, 761 F.2d 827, 840 (1st Cir.1985) (acknowledging the need for independent review by appellate court of mixed question of law and fact). *But see McGee v. South Pemiscot School District R–V*, 712 F.2d 339, 342 (8th Cir.1983) (question of whether employee's action created disharmony negating constitutional protection is for the jury). The second element of the plaintiff's case—whether the state's action was motivated by Wren's conduct—raises a question of fact for the jury. *See Knapp*, 757 F.2d at 845.

Here the trial court correctly ruled as a matter of law that Wren's First Amendment activities involved topics of public concern. Bearing in mind the Supreme Court's admonition that "public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record," *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690, we agree with the trial court's disposition. The content of the WEA letter in this case included several complaints about which the community would be understandably concerned, e.g., high faculty turnover and sexual harassment of students and teachers.[1] In addition, these allegations were

---

1. We recognize that it is not always enough that the subject matter of a communication be one in which there *might* be general interest, *Wilson v. City of Littleton, Colorado*, 732 F.2d 765, 768 (10th Cir.1984) (quoting *Connick*, 461 U.S. at

148 n. 8, 103 S.Ct. at 1691 n. 8), but that what is *actually said* on the topic is the crux of the public concern content inquiry. Here a majority of the teachers, including Wren, made numerous accusations about a principal whose

presented in the form of a letter from the majority of the school's faculty members calling for an investigation.[2] Its context was a small community in which the school was the hub of activity. Spurlock was not entitled to a directed verdict on this issue.

■ The trial judge also correctly denied Spurlock's motion for directed verdict on the issue of the balance between the state's interest in efficient service and Wren's right to express her views. Although the trial court erred in leaving that balance to the jury, rather than ruling on it as a matter of law, we are satisfied that the jury implicitly reached the correct result. Thus the error does not require reversal. *See Roberts*, 773 F.2d at 955 & n. 4; *cf. Loya v. Desert Sands Unified School District*, 721 F.2d 279, 281–82 (9th Cir.1983) (new trial required when jury incorrectly instructed that it must decide balancing question and appellate court disagreed with its conclusion).

Under the *Pickering* test, Wren's First Amendment rights are protected, "unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee." *Childers*, 676 F.2d at 1341; *accord National Gay Task Force v. Board of Education*, 729 F.2d 1270, 1274 (10th Cir.1984), *aff'd*, — U.S. —, 105 S.Ct. 1858, 84 L.Ed.2d 776 (1985). Here it is undisputed that Spurlock recommended Wren for contract renewal after her first grievance and that the school board refused to accept his later recommendation that she be terminated, which followed the WEA letter and his resulting reprimand. It is reasonable to infer from these actions that the school authorities were satisfied with Wren's teaching, despite Spurlock's stated opinion that she should resign. The superintendent testi-

fied that the problem with Wren was not her classroom performance. And, to this day, the school board has not terminated Wren formally. In view of this evidence of Wren's continuing competence, the *Pickering* balance tips in her favor. Her speech therefore was constitutionally protected as a matter of law and should have been so designated by the trial judge.

■ Spurlock's third ground for a directed verdict—that Wren failed to produce enough evidence to reach the jury on the issue of his motivation—also must fail. In her case-in-chief, Wren presented a wealth of evidence from which a reasonable jury could infer that her conduct was a substantial factor or the motivating factor in Spurlock's later actions toward her. She was suspended by the superintendent, who traveled to Baggs on Spurlock's request, the day after the district teachers' association voted to seek the WEA investigation. Her termination was sought for the first time approximately two months after Spurlock was reprimanded as a result of the WEA investigation. Her written and oral reprimands had increased in number after the WEA letter, and she testified that Spurlock frequently referred to the WEA investigation. In view of this evidence, a directed verdict in Spurlock's favor on the issue of retaliatory motive would have been inappropriate. Rather, the jury's finding that such motive existed is reasonable.

### III

■ Spurlock contends that the trial court committed reversible error in allowing a clinical psychologist to repeat another doctor's statement characterizing Spurlock as a "sociopath." Wren argues that Spurlock waived any right to appeal on this issue.

conduct had been questioned previously. Pl. Ex. 450 (letter from Spurlock to school board describing earlier conflicts). Thus the content of the speech points toward a finding of public concern.

2. This mode of (public presentation) among other things, distinguishes this case from *Sipes v. United States*, 744 F.2d 1418, 1423 (10th Cir.

1984), in which we upheld the discharge of an Air Force base worker who had merely complained privately to his superior about inconsistent application of the rules to him. *See also Wilson*, 732 F.2d at 769 (upholding discharge of police officer who refused to remove shroud from badge because of personal grief).

Spurlock called the witness, Dr. Jacques Herter, to testify about his evaluation of Wren's mental state. Herter had concluded that Wren was capable of returning to work. Herter testified on direct examination that, in the course of his evaluation, he had spoken with Dr. Arthur Merrell, Wren's treating psychiatrist. On cross-examination, Wren's counsel asked Herter more about the conversation:

"Q. Using those notes I would like you to, as best you can, filling in the verbs between the notes, tell the jury what Dr. Merrell told you when you consulted with him about Mrs. Wren.

A. Start from the top?

Q. Yes. Just read it through as though you were reporting the conversation to us but you have the benefit of having the notes.

A. Okay. The first thing we talk about was whether or not she was an obsessive compulsive individual. And both of us agreed. At this stage don't know who said it first but we agreed on that, she was an obsessive compulsive, plotter, driving, hard working.

He said it was a tragedy that this had taken place for her because she was such a hard working individual with a high value system. He stated that she was real tense, were his words.

He stated with the right supervisor she would be great. And although it's not in my notes, he made reference to the fact the right supervisor that she would just work herself to death, that anything could be gotten out of her.

Q. Okay.

A. I asked him if I was reading her well. And he said yes. And then I asked him if she were a paranoid personality in that was she being over suspicious, manufacturing things. And he said no.

MR. ORR [Spurlock's counsel]: Your Honor, I would object at this time. I would anticipate he is about to relate part of this conversation which is irrelevant to the question of cross examining this witness and is hearsay in that respect.

MR. HACKER [Wren's counsel]: Your Honor, I'm offering this, I'm going to go through the things he relied on and I think under expert opinions he talked about part of the conversation. I ought to be able to put in from his notes what he took from Dr. Merrell.

MR. ORR: What is coming comes from Dr. Merrell.

THE COURT: I'm sorry you can't object to part of it and not object to the rest. The jury, however, is instructed that this is hearsay. It's received, though, not for the truth of the matter but for the fact that this is what Dr. Merrell told Dr. Herter and thereby, formed a basis for the opinions that Dr. Herter has expressed.

It is relevant insofar as it goes to Dr. Herter's opinions. For that purpose, you can regard it as having been said or not having been said, whatever you choose to believe.

MR. ORR: For the record I would include, I would state it is irrelevant to any diagnosis or opinion Dr. Herter has as to Mrs. Wren and hearsay.

THE COURT: Well, as I say, I feel you've waived your hearsay objection both on direct and also on the preceding portion of this conversation.

Q. (BY MR. HACKER) Doctor, do you remember where we left off or where you left off? Continue to recount the conversation as you can recall it, based on your notes.

A. I asked him if I was reading it well. By that I meant if I was reading her well based on my test results and observations. He said I was. Then I asked him if he felt that she was being paranoid. And that's used loosely by psychologists and psychiatrists in talking to one another, in that was she someone just fabricating a lot of things and he said no, he didn't feel that she was paranoid.

Then he commented offhand, the next thing in the notes here is that Spurlock's probably a sociopath. As I mentioned in

the deposition with Mr. Hacker, again because of the nature of our work and profession we banty [sic] around a lot of terms that if we had to be held to the exact definition of those terms, we could get in a little bit of trouble.

Because here he's calling Spurlock a sociopath and I don't know Mr. Spurlock. But true sociopaths are in jail, people with no anxiety, no conscience, no guilt, no morality, capable of awesome deeds. But he's calling him a sociopath here.

Then the next thing I asked was well, how severe do you feel her depression is and his comment was that it was moderate.

THE COURT: Ladies and Gentlemen of the Jury, the comment with respect to Mr. Spurlock does, it turns out, become irrelevant to the opinion of Dr. Herter with regard to Mrs. Wren. You're instructed to disregard it."

R. XI, 52–56.

We disagree with Wren's contention that Spurlock's counsel failed to object adequately to this testimony, thereby waiving further appeal. Defense counsel specifically asserted that the testimony would be hearsay and irrelevant as material on which Herter relied for his diagnosis of Wren. The trial court characterized the hearsay objection as waived and admitted the testimony after cautioning the jury that it was relevant only "insofar as it goes to Dr. Herter's opinions." This exchange adequately preserved the relevancy objection for appeal. *See Markel Service Inc. v. National Farm Lines*, 426 F.2d 1123, 1128 (10th Cir.1970) (overruled objection protects the record on the ground specified). No further objection was necessary once the trial judge conceded that the "sociopath" comment was irrelevant.

██ The decision to admit or exclude evidence on relevancy grounds is within the sound discretion of the trial court and will be upheld absent clear abuse. *K–B Trucking Co. v. Riss International Corp.*, 763 F.2d 1148, 1155 (10th Cir.1985). Further, unless error in the admission or exclusion of evidence prejudiced Spurlock's substan-

tial rights, we will not set aside the jury's verdict. *Motive Parts Warehouse*, 774 F.2d at 396.

We see no cause for reversal in this case. Immediately after the "sociopath" comment the trial court instructed the jury to disregard it, and, at both the outset and conclusion of the trial, the trial judge instructed the jury to disregard any evidence the court rejected. In addition, Herter clearly intended for the jury to understand that the term was not used in a scientifically exact or diagnostic sense. Indeed, he emphasized that he did not even know Spurlock. In view of these actions and qualifications on the "sociopath" comment, we find that there was no prejudicial error.

## IV

██ Spurlock next contends that the trial court erred by submitting Special Interrogatory No. 4 to the jury, because it was compound and misleading. The interrogatory asked, "Did the Defendant Nyles Spurlock take the actions complained of by the Plaintiff with the malicious intention to deprive the Plaintiff of her Constitutional rights or cause other injury to the Plaintiff?" R. II, 291. Spurlock argues that the jury could thus have awarded damages to Wren for injuries other than those related to her exercise of First Amendment rights. Spurlock failed to object to the interrogatory at trial; thus the interrogatory is reviewable only if it is "plain error."

Although we will review "plain and significant" errors in jury instructions not properly objected to at trial, *Fox v. Ford Motor Co.*, 575 F.2d 774, 786 (10th Cir. 1978), this power is used sparingly. *Lusby v. T.G. & Y. Stores, Inc.*, 796 F.2d 1307, at 1311 (10th Cir.1986) (citing *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985)); *Pridgin v. Wilkinson*, 296 F.2d 74, 76 (10th Cir.1961). We do not employ it unless the error "may well have been a generating factor which culminated in a verdict not warranted under the law," *Pridgin*, 296 F.2d at 76, or when the record demonstrates on its face that a mis-

carriage of justice may occur. *Fox,* 575 F.2d at 786 (quoting 5A *Moore's Federal Practice,* ¶ 51.04). And, finally, "we must view the instruction error in the context of the entire record." *Lusby,* at 1312 (citing *Young,* 105 S.Ct. at 1047).

We do not think this is an appropriate case for such extraordinary review. We have refused to review much more obvious ambiguity in special jury instructions when counsel failed to object before the jury was dismissed. *See Bell v. Mickelsen,* 710 F.2d 611, 616 (10th Cir.1983). And we note that the jury in this case repeatedly received accurate information on the nature of the case and on the necessity for finding a violation of Wren's constitutional rights before awarding damages.

## V

■ Spurlock also challenges six of the trial court's jury instructions, the first of which we dealt with in our discussion of the *Pickering* balance in Part II. Instruction No. 12 incorrectly placed the *Pickering* balance before the jury, but it did not result in reversible error because we agree with the jury's implicit conclusion on that legal issue.

■ Spurlock next argues that Instructions 14, 15, and 16 were unsupported by the evidence. Instruction No. 14 stated that a school administrator could not punish a teacher for "holding ideas or philosophies contrary to those held" by the administrator. R. II, 309. Instruction No. 15 stated that a teacher could not be "discharged for using a particular teaching method or technique relevant to the proper teaching of the subject matter involved unless the school district has established that the teacher was put on notice either by regulation or otherwise before adverse action was taken." R. II, 310. Instruction No. 16 recited Wyoming law on the rights of continuing contract teachers such as Wren, including the procedure necessary for proper termination. Spurlock specifically argues that No. 16 was prejudicial and confusing because Wren never was terminated formally.

We reject Spurlock's contentions. "Under federal law, an instruction is proper if supported by competent evidence." *Achin v. Begg Tire Center,* 694 F.2d 226, 228 (10th Cir.1982); *accord Trigg v. City and County of Denver,* 784 F.2d 1058, 1059 (10th Cir.1986). When presented ample competent evidence from which a jury could infer under Instructions No. 14 and 15 that Spurlock's negative actions were spawned by his disagreement with Wren's personal views and teaching style. And the school superintendent admitted that the number of Wren's reprimands increased as she became more outspoken about Spurlock's conduct. With respect to Instruction No. 16, although it is true that Wren never was terminated formally, the specter of termination loomed over her at least three times: after her suspension by the superintendent, and after Spurlock's two recommendations to the school board that she be fired. The procedures the board must have observed if it were to follow through were therefore relevant. In addition, Instruction No. 16 also informed jury members of the proper causes for such termination, which would assist them in evaluating the justification for Spurlock's admitted desire to see Wren resign.

Spurlock also challenges Instruction No. 21, which said:

"A person who has a condition or disability at the time of an injury is not entitled to recover damages therefor. However, she is entitled to recover damages for any aggravation of such preexisting condition or disability proximately resulting from the injury.

This is true even if the person's condition or disability made her more susceptible to the possibility of ill effects than a normally healthy person would have been, and even if a normally healthy person probably would not have suffered any substantial injury.

When preexisting condition or disability is so aggravated, the damages as to such condition or disability are limited to the additional injury caused by the aggravation."

R. II, 317. We do not agree with Spurlock's argument that this instruction improperly eliminated Wren's burden of showing causality between Spurlock's conduct depriving her of her rights and her injuries. Nothing in Instruction No. 21 contradicts or clouds the directive of Instruction No. 7, which told the jury that Wren must show Spurlock's conduct was the proximate cause of her injuries. Further, Instruction No. 18 defined proximate cause. If anything, Instruction No. 21 strengthened the potentially positive impact on defendant's case of the causality instructions. Like them, it tended to limit the amount of recoverable damages. It ensured that the jury would award only that sum arising from Spurlock's aggravation of whatever preexisting condition or disability may have plagued Wren, not the sum that would compensate her for her total disability.

■ Spurlock finally challenges Instruction No. 25, which allowed for an award of punitive damages if the jury found by a preponderance of the evidence that his acts were "maliciously or wantonly, or oppressively done." R. II, 321. Spurlock contends that this instruction should have been refused as a matter of law, because the record lacks any probative facts on the issue.

We disagree. Punitive damages are available in § 1983 actions, and evidence of "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness" of such an award. *Smith v. Wade*, 461 U.S. 30, 51, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983); *see also Miller v. City of Mission, Kansas*, 705 F.2d 368, 377 (10th Cir.1983) (allowance of punitive damages within the discretion of the trier of fact). More than enough evidence exists in this record to reach the jury on the punitive damages issue. Spurlock testified that he considered Wren's conduct unprofessional even though he knew she had a right to file a grievance. Even during the adjudication of her first grievance, he thought the simple solution would be Wren's resignation.

Wren testified, among other things, that Spurlock said he would be after her job, regardless of the outcome of her first grievance; that he talked about hitting her daughter; that his observations of her teaching increased in number and negative focus after the WEA letter; and that he threatened to sue her and smear her in the newspaper. In light of this testimony, the numerous observation report exhibits, and Spurlock's role in Wren's suspension, it was permissible for the jury to infer that Spurlock acted recklessly or in callous disregard of her rights. If anything, the wording of the instruction favored Spurlock by omitting reference to recklessness, thereby elevating the legal standard. The instruction was proper on the facts of this case.

## VI

■ Spurlock argues that both the compensatory and punitive awards were excessive.

We note that the determination of damages is for the jury. *Whiteley v. OKC Corp.*, 719 F.2d 1051, 1058 (10th Cir.1983). And, "absent an award so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invalidated the trial, the jury's determination of the fact is considered inviolate." *Hurd v. American Hoist & Derrick Co.*, 734 F.2d 495, 503 (10th Cir.1984) (quoting *Garrick v. City and County of Denver*, 652 F.2d 969, 971–72 (10th Cir.1981)); *see also Barnes v. Smith*, 305 F.2d 226, 228 (10th Cir.1962).

We are not shocked at the amounts of compensatory and punitive damages awarded to Wren in this case. Although the evidence on her ability to return to work was conflicting, there is sufficient consistent evidence to sustain the jury verdict. *See Whiteley*, 719 F.2d at 1058. Wren's economic expert testified that the present value of Wren's lifetime earnings from the school district was $636,896. We have already recited some of the evidence

justifying the punitive damages instruction, from which the jury could have inferred that Spurlock's conduct was malicious and at least partially responsible for Wren's noneconomic injury.

## VII

■ Finally, Spurlock argues that he is entitled to set off against the verdict the $125,000 settlement paid by his former co-defendants, the school district and school superintendent, because Wren's injury was "indivisible." The trial court ruled against Spurlock's motion for relief from judgment on this issue, reasoning that the claims against Spurlock were divisible from those against the codefendants and that the jury was adequately instructed to award only those damages that Spurlock proximately caused. The trial court therefore declined to determine whether federal or state law controlled contribution in § 1983 actions. Spurlock contends that both would mandate the setoff; Wren argues that Wyoming law controls and would not require setoff.

We also decline in this case to determine whether federal or state law governs contribution in a § 1983 action and what is the precise content of the standard. *Compare Miller v. Apartments and Homes of New Jersey, Inc.,* 646 F.2d 101, 108–110 (3d Cir. 1981) (federal law determines availability of contribution in federal civil rights actions) *with Johnson v. Rogers,* 621 F.2d 300, 304 n. 6 (8th Cir.1980) (state law controls effect of plaintiff's settlement with one defendant on nonsettling codefendant) *and Gray v. City of Kansas City, Kansas,* 603 F.Supp. 872, 873–76 (D.Kan.1985) (may look to state law to determine whether right to contribution exists). This is not a case for contribution. Rather, we agree with the trial court that Wren's injury and resulting damages were divisible and therefore capable of apportionment by the jury.[3]

The evidence in this case contained numerous instances of allegedly harassing and retaliatory conduct by Spurlock alone, as well as instances when the school district or superintendent had acted on his advice. This therefore is unlike the classic situation in which two defendants struggle for the same gun and succeed in shooting the plaintiff, causing an unquestionably indivisible harm. *See* W. Prosser, *Handbook of the Law of Torts* 314 (4th ed. 1971). Rather, in the circumstances of this case, the harm Wren suffered was one for which there was a "reasonable basis for division" among the defendants. *See Restatement (Second) of Torts* § 881 (1977). "Where such apportionment can be made without injustice to any of the parties, the court may require it to be made." *Id.* at § 433 A comment d (1963).

There was no injustice to Spurlock here. The jury was told immediately that there had been a settlement; the court explained that it did not affect the claims against Spurlock. During closing argument, Spurlock's counsel attempted to separate his client from and emphasize the responsibility of the now-dismissed codefendants. The court explicitly instructed the jury on the necessity of finding *Spurlock's* conduct to be the proximate cause of Wren's injuries.

The harm to Wren, i.e., her mental problems and resulting loss of employment, is not obviously divisible into those discrete portions attributable to Spurlock and those not so attributable. But that difficulty is not Wren's fault.[4] The courts have been liberal in allowing juries to award damages in situations when the uncertainty of apportionment "arises from the nature of the wrong itself, for which the defendant, and not the plaintiff, is responsible." W. Prosser at 318–19.

---

3. Thus the first of the two principal elements of a common-law right to contribution is not present: common liability. *See Northwest Airlines, Inc. v. Transport Workers,* 451 U.S. 77, 83, 87–88, 101 S.Ct. 1571, 1576, 1578–79, 67 L.Ed.2d 750 (1981); *Dobson v. Camden,* 725 F.2d 1003, 1006 (5th Cir.1984) (en banc).

4. It also is notable that no contribution like that sought by Spurlock in the form of a setoff was allowed historically when the tortious conduct was intentional. W. Prosser, *Handbook of the Law of Torts* 306 (4th ed. 1971).

**1324**

The judgment of the district court is AFFIRMED.