891 F.2d 1485
 57 Ed. Law Rep. 1154
 Ellen F. JOHNSEN, R.N., Plaintiff/Appellant,
v.
INDEPENDENT SCHOOL DISTRICT NO. 3 OF TULSA COUNTY, OKLAHOMA,
a/k/a Broken Arrow Public Schools, Theo Smith, Jim Goodwin,
Max Brissey, Bob Morris, and D.C. Anderson, Individually and
in their official capacities as Board Members of Independent
School District No. 3, Dr. C.G. Oliver, Jr., Education
Director, Individually and in his official capacity as
Superintendent of Independent School District No. 3, and Dr.
Don Hall, Education Director, Individually and in his
official capacity, Defendants/Appellees.
 No. 86-2759.
 United States Court of Appeals,
Tenth Circuit.
 Dec. 19, 1989.
 
 Louis W. Bullock of Bullock & Bullock, Tulsa, Okl., for plaintiff/appellant.
 Ronald L. Day of Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, Okl. (Laurie W. Jones of Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, Okl., with him on the brief), for defendants/appellees.
 Karen L. Long of Oklahoma Educ. Ass'n, Oklahoma City, Okl., filed brief amicus curiae, for Oklahoma Educ. Ass'n.
 Larry Lewis of Oklahoma State School Boards Ass'n, Oklahoma City, Okl., filed brief amicus curiae, for Oklahoma State School Boards Ass'n.
 Before HOLLOWAY, Chief Judge, and HENLEY* and EBEL, Circuit Judges.
 EBEL, Circuit Judge.
 
 
 1
 Plaintiff brought this action under 42 U.S.C. § 1983, alleging that her First Amendment rights were violated when her contract as a school nurse was not renewed after she spoke out against the school district's medication policy. After the jury awarded plaintiff $10,000 in damages, the district court granted a judgment notwithstanding the verdict in favor of the defendants because plaintiff's speech was not protected under the balancing test of Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Plaintiff appeals the district court's decision granting the judgment notwithstanding the verdict. We affirm.
 
 FACTS
 
 2
 Plaintiff Ellen Johnsen was hired as a school nurse by Broken Arrow Public Schools for the 1982-83 school year.[1] Plaintiff was the sole nurse assigned to two different schools between which she split her work time.
 
 
 3
 As the school year began, plaintiff became concerned about the school system's medication policy, which allowed nurses, with only parental permission, to administer prescription and nonprescription drugs to students. Plaintiff believed that the Oklahoma Nursing Practice Act, Okla.Stat.Ann. tit. 59, § 567.1-567.16 (1989), did not allow a nurse to administer any medicine without a doctor's authorization.[2] Plaintiff expressed her concern to Dr. Don Hall, the school administrator who supervised the health service program within the school system.
 
 
 4
 Plaintiff was selected to serve as a member of a committee formed by the nurses to review the medication policy and draft a new policy to present to the administration. The nurses submitted the new policy to the administration. In December 1982, Dr. Hall announced that the policy submitted by the nurses had not been adopted and that the nurses should continue to administer nonprescription drugs as permitted by the existing policy or find other employment.
 
 
 5
 The School Board, however, did not ignore the nurses' concerns and preformed its own independent investigation of the medication policy. The Board hired legal counsel which determined that it was not unlawful for the school nurses to administer nonprescription drugs with parental permission. The Board also discussed the issue with the state department of education.
 
 
 6
 While the nurse committee was studying the issue and prior to using the school district's internal complaint procedure, plaintiff hired legal counsel and began to contact outside government agencies, including the Governor's office, the Oklahoma State Board of Education, the Attorney General's office, the Oklahoma Board of Nurse Registration and Nursing Education, and the School Nurses' Association of Oklahoma. Plaintiff distributed the information she received from the outside agencies to the other school nurses through inter-school mail. She also called other school nurses during school hours to discuss the issue.
 
 
 7
 Plaintiff frequently voiced her concerns about the medication policy at the monthly meetings of the school district's nurses. Some of the nurses testified that plaintiff dominated those meetings, stifling others from speaking out. The meetings became unproductive because of the discord surrounding the medication policy.
 
 
 8
 The information the other school nurses received from plaintiff and the controversy surrounding the medication policy caused many of the nurses to fear that they might lose both their jobs and their nursing licenses. Plaintiff threatened another nurse that she would report the nurse to the state board of nursing for illegally administering drugs.
 
 
 9
 Plaintiff sent the information she gathered to Dr. C.G. Oliver, Jr., the Superintendent of the Broken Arrow Public Schools. Dr. Oliver requested that plaintiff use the formal complaint mechanism designed by the school system to allow employees to voice their grievances. Dr. Oliver also admonished her for seeking legal counsel and contacting outside agencies prior to using internal procedures. The complaint procedure was set out in detail in the school district's policies. A copy of the district's policies including the complaint procedure had been given to plaintiff when she was employed. In addition, a principal in one of the schools where plaintiff worked went over the procedure with her. Plaintiff eventually used the school complaint procedure after being expressly instructed to do so by her principal and Dr. Oliver.
 
 
 10
 On March 21, 1983, plaintiff spoke at the school board hearing discussing proposed changes to the medication policy and told the school board at that public meeting that the nurses were "indiscriminately" administering drugs to the students. Plaintiff had previously used the term "indiscriminate" in written communications and in discussions with parties outside the school system. Plaintiff's allegation of indiscriminate administration of drugs was quoted in the newspapers and several nurses were questioned by the public as to their practices. Evidence at trial demonstrated that this accusation was false, and that the nurses were cautious in administering the drugs and would exercise their discretion not to administer a drug to a child if it would endanger the child's health.
 
 
 11
 After the school board hearing, the Board adopted a revised medication policy which addressed the majority of plaintiff's concerns. The policy precluded the administration of prescription drugs without a medical order, but it did continue to permit the administration of non-prescription drugs with only parental consent.
 
 
 12
 On April 4, 1983, two weeks after the meeting on the medication policy, the Board met again and voted not to renew plaintiff's contract. Plaintiff asked for, and received, a hearing review of the Board's decision not to renew her contract. The hearing took place on June 2 through June 3, 1983. At the hearing, plaintiff had counsel and the right to offer evidence. The Board upheld its original decision, believing that plaintiff had created a divisive atmosphere among the health services staff. However, the quality of plaintiff's work was not questioned.
 
 
 13
 Plaintiff then filed this § 1983 suit, alleging that her contract was not renewed because she had spoken out against the medication policy of the school district. At the end of the trial, the district court improperly submitted the determination of whether plaintiff's speech was constitutionally protected to the jury,[3] which returned a verdict for the plaintiff and awarded her $10,000. The district court granted a judgment notwithstanding the verdict in favor of defendants, holding that plaintiff's speech, as a matter of law, was not constitutionally protected under the Pickering balancing test because plaintiff's speech disrupted the operation of the school system, undermined the administration's authority, and impaired the working relationships of the health services. Johnsen v. Independent School Dist., No. 85-C-54-B, at 12-13 (N.D.Okla.) (filed Oct. 22, 1986).
 
 DISCUSSION
 I. Standard of Review
 
 14
 We review a decision to grant a judgment notwithstanding the verdict de novo. Guilfoyle v. Missouri, Kan. and Tex. R. Co., 812 F.2d 1290, 1292 (10th Cir.1987). This court must determine whether the evidence and inferences drawn from the evidence, viewed in the light most favorable to the nonmoving party, are so clear that reasonable minds could not differ as to result. Id. A court always reviews de novo the Pickering determination of whether the employee's interests in making the statement are outweighed by the state's interests as employer. Koch v. City of Hutchinson, 847 F.2d 1436, 1441 & n. 14 (10th Cir.) (en banc), cert. denied, --- U.S. ----, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988).
 
 II. Analysis
 
 15
 The Supreme Court in Mount Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), set out a three-prong test to determine whether an adverse employment decision violates a public employee's First Amendment right to free speech. Under that test, a public employee must first show that, as a matter of law, his or her speech was constitutionally protected. Id. at 284, 97 S.Ct. at 574. Second, the employee must demonstrate that the protected speech was a substantial or motivating factor in the adverse employment decision. Id. at 287, 97 S.Ct. at 576. Finally, the burden shifts to the employer to show by a preponderance of the evidence that the employer would have made the same decision even in the absence of the protected speech. Id.
 
 
 16
 With regard to the first prong of the Mount Healthy test, the Supreme Court in Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), articulated a two part test to determine whether speech is constitutionally protected. First, the plaintiff must show that the speech touches on a matter of public concern. Pickering, 391 U.S. at 568, 88 S.Ct. at 1734. Second, after the employer has established its interest "in promoting the efficiency of the public services it performs through its employees," the court must balance the employee's interests against the employer's interest. Id.
 
 A. Public Concern
 
 17
 In Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court held that a matter of public concern must relate to a "matter of political, social, or other concern to the community." Connick, 461 U.S. at 146, 103 S.Ct. at 1689. Plaintiff's speech in this case deals with the school district's medication policy. The medication policy potentially impacts the health of the children attending the school. Therefore, plaintiff's speech sufficiently touches on a matter of public concern to warrant placing the speech on the Pickering scales to determine whether the speech was constitutionally protected.
 
 B. Pickering Balance[4]
 
 18
 1. Considering speech as a unitary whole or as separate component items of speech
 
 
 19
 Plaintiff's crusade to change the school board's medication policy stretched over several months and involved multiple incidents, some of which were more deserving of protection than others.[5] However, the district court considered plaintiff's entire activity as a unitary whole and performed a single Pickering balancing analysis. Potentially different results might be obtained if each individual incident was weighed separately against the disruption caused by that particular incident. Although a small portion of speech taken by itself may be protectable under Pickering, when the speech in its totality is considered it might not be protected. See, e.g., Berry v. Baily, 726 F.2d 670, 676 (11th Cir.1984) (Combining one remark unrelated to plaintiff's job as deputy sheriff with other remarks that did relate to the plaintiff's job for the purpose of performing a single Pickering balancing analysis because all the remarks were related to the disciplinary structure of plaintiff's job), cert. denied, 471 U.S. 1101, 105 S.Ct. 2326, 85 L.Ed.2d 844 (1985). Thus, we must first decide whether the Pickering balancing test should be applied to plaintiff's speech, considered as a whole, or whether each instance of speech should be balanced separately. See Eiland v. City of Montgomery, 797 F.2d 953, 957 (11th Cir.1986) (district court reversed for improperly dividing a poem into protected and unprotected stanzas before performing the Pickering balance test), cert. denied, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).
 
 
 20
 The issue of whether speech involving multiple incidents or subjects should be considered separately in applying the Pickering balancing test arises in a wide spectrum of circumstances. At one extreme is the situation where there is a single instance of speech that touches on interrelated subjects. Because of the difficulty in determining the impact of a portion of a single instance of speech without examining the entire instance, "[t]he task under Pickering is ... to determine whether the employee's interests in the speech as a whole outweigh the public employer's interests." Eiland v. City of Montgomery, 797 F.2d 953, 957 (11th Cir.1986), cert. denied, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987) (emphasis added).
 
 
 21
 [A]ny such instances of speech should not be broken down into separate pieces of protected and nonprotected speech, but should rather be treated as protected speech for the purposes of the Pickering balance and the causation determination. In other words, when undertaking the Pickering balancing equation, the district court may take into account the fact that not all of the speech may have been protected.
 
 
 22
 Kurtz v. Vickrey, 855 F.2d 723, 733 (11th Cir.1988).
 
 
 23
 Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), is an example of a court considering speech as a whole even though portions of the speech did not touch on matters of public concern. In Connick, an assistant district attorney was discharged after distributing a multi-question questionnaire concerning office policy, morale, and employee confidence in supervisors. The Court determined that only the question asking whether employees felt pressured to work in political campaigns touched on a matter of public concern. Nevertheless, the Court went on to consider the entire questionnaire in balancing the interests. 461 U.S. at 149-54, 103 S.Ct. at 1691-94. The Court held that because the "questionnaire touched upon matters of public concern in only a most limited sense" the employer could discharge the employee for speech which he reasonably believed would disrupt the office. Connick, 461 U.S. at 154, 103 S.Ct. at 1693.
 
 
 24
 Courts have cited Connick for the proposition that a single instance of speech should not be divided for purposes of applying the Pickering balance. See, e.g., Hesse v. Board of Educ., 848 F.2d 748, 753 n. 4 (7th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1128, 103 L.Ed.2d 190 (1989); Eiland v. City of Montgomery, 797 F.2d 953, 957 (11th Cir.1986), cert. denied, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). In Connick, "the Court applied the Pickering balancing test to the survey as a whole, rather than to the single question relating to a matter of public concern." Kurtz, 855 F.2d at 732 n. 7 (emphasis in original).
 
 
 25
 At the other end of the spectrum is the situation where the court must consider multiple instances of speech, each dealing with separate subjects. There, the court may treat each instance of speech separately in applying the Pickering balance. See Kurtz v. Vickrey, 855 F.2d 723, 732-33 (11th Cir.1988).
 
 
 26
 Between those two situations lies less clear circumstances where the speech involves one instance but multiple distinct subjects or the speech involves multiple instances but only one subject. Under those circumstances, the question of whether speech should be balanced separately is fact sensitive and depends on how interrelated are the different aspects of the speech. Factors that could be considered in determining whether the speech is interrelated include the time frame in which the speech occurred, the different audiences to which the speech may have been directed, the continuity of the speech, and the degree to which the different aspects of speech built upon each other to create a cumulative impact on the state employer.
 
 
 27
 Kurtz v. Vickrey, 855 F.2d 723 (11th Cir.1988), is an example of how the time frame of the speech was considered by the court in permitting the division of different instances of speech. In Kurtz, a university professor filed suit because he was denied a promotion allegedly in violation of his First Amendment rights. The speech in question involved several instances over many years concerning different subjects of varying degrees of importance. In part because of the number of years in which the speech occurred, the court in Kurtz upheld the district court's decision to separate the speech for purposes of conducting the Pickering balancing test. Id. at 732-33.
 
 
 28
 In Hesse v. Board of Education, 848 F.2d 748 (7th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1128, 103 L.Ed.2d 190 (1989), the court held that a teacher's transfer in status was warranted by the school's interest in discipline. The speech involved in Hesse included multiple memoranda to school officials. The court found that only one of the memoranda arguably touched on a matter of public concern. Id. at 752. However, the court did not merely view the memorandum in "isolation" but also considered the memorandum "from the vantage point of its cumulative disruptive effect on the Board's ability to maintain harmony and discipline in the workplace." Id. at 753 n. 4 (emphasis added); see also Berry v. Baily, 726 F.2d 670, 676 (11th Cir.1984) (five instances of speech considered jointly because they were "part of a set of actions posing a threat to the disciplinary structure"), cert. denied, 471 U.S. 1101, 105 S.Ct. 2326, 85 L.Ed.2d 844 (1985).
 
 
 29
 In this case, plaintiff's speech consisted of multiple instances addressing the same issue of the medication policy. Although the speech spanned several months, plaintiff was actively pursuing her concerns throughout that period. Most importantly, the different instances of plaintiff's speech built on each other to such an extent that it is difficult to separate the impact of one instance from the impact of another. It is difficult to determine whether the other school nurses feared that plaintiff was jeopardizing their nursing licenses because plaintiff sent them information that she had received from her contacts with outside agencies, because of the publicity she was generating in part through false accusations, because of her threats to turn in a nurse, or because of plaintiff's conduct during the monthly nursing meetings. Therefore, because the speech was a concerted, cohesive campaign on a single subject, the speech should be considered in its entirety for purposes of the Pickering balancing test.
 
 2. Balancing the Interests
 
 30
 Considering plaintiff's speech as a whole, the district court was correct in determining that the speech was not protected because of its disruptive effect on the school district's health service program. In general, "an employee's First Amendment rights are protected unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee." Childers v. Independent School District No. 1, 676 F.2d 1338, 1341 (10th Cir.1982). Here, the inquiry is whether the school district adequately proved that her speech disrupted the health service program of the school. See Wren v. Spurlock, 798 F.2d 1313, 1318 (10th Cir.1986), cert. denied, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987).
 
 
 31
 We conclude that plaintiff's speech was needlessly disruptive of the school district's health service programs. First, plaintiff erroneously stated that the nurses were administering drugs "indiscriminately." R. 392. The charge of indiscriminate administration of drugs was repeated orally at a public meeting of the school board and appeared in some of plaintiff's written communications. R. 155-56, 250. Plaintiff's statement was at least careless and could be characterized as reckless in light of the predictable impact that such a statement would have on the public. Evidence introduced at trial indicates that the nurses had exercised their professional discretion in administering drugs to the students. R. 244-45, 405-06. False statements by an employee are weighed against plaintiff's interests on the Pickering balance if the statements were "so closely related to the day-to-day operations of the schools that any harmful impact on the public would be difficult to counter because of the [employee's] presumed greater access to the real facts." Pickering, 391 U.S. at 572, 88 S.Ct. at 1736. An allegation of indiscriminate administration of drugs is serious and bears directly on the "day-to-day operations of the schools." Id.
 
 
 32
 Publicity about the allegation of indiscriminate administration of drugs caused several nurses to be questioned by the public as to their practices. R. 405-408. The public's concern about the nursing program created by the false allegation resulted in a "harmful impact on the public [which was] difficult to counter." Id. Moreover, the exaggerated allegation of indiscriminate administration of drugs unfairly discredited the school nursing program. In Rankin v. McPherson, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), the Court held that the employee's speech was protected, but in examining the speech under Pickering, the Court considered whether plaintiff "had discredited the office by making her statement in public." Id. at 389, 107 S.Ct. at 2899. Plaintiff's statement that the school nurses were administering drugs "indiscriminately" weighs against plaintiff in applying the Pickering balance because her statement was false and unfairly discredited the school nursing program.
 
 
 33
 Second, the monthly meetings of all the school nurses in the district eventually became unproductive because of the discord created by plaintiff's continual complaints about the medication policy. R. 370. The other nurses feared to speak during the meetings. Plaintiff was taking copious notes at the meetings, and the nurses worried that plaintiff would later quote the nurses out of context. R. 628-29.
 
 
 34
 Third, several nurses felt that plaintiff had threatened to report them to the nursing board, thus jeopardizing their nursing licenses for illegally administering medication. R. 402-03, 511, 534-35. The threats were extremely disruptive to the nursing staff and to the school district's ability to coordinate the health service program because plaintiff's threats resulted in a high level of anxiety among the nurses. R. 511, 527.
 
 
 35
 The Supreme Court has stated that pertinent considerations in applying the Pickering balance include: "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 483 U.S. 378, 388, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987). The monthly nurses meetings, which became unproductive because of plaintiff's actions, were an important part of the overall health service program of the school district. Plaintiff's ability to get along with her co-workers was also an important part of the program. Similarly, it was important to the school district to be able to maintain discipline whereby its nurses would follow district guidelines without being intimidated by fear that plaintiff would turn them in and cause them to lose their nursing license. Plaintiff's speech resulted in serious discord between the other school nurses and plaintiff and consequently the speech "interfere[d] with the regular operation of the enterprise." Id.
 
 
 36
 Finally, plaintiff only resorted to the school district's internal complaint mechanism late in the school year and only after being expressly instructed to do so by her principal. R. 46-52, 148-50. The complaint procedure was in writing and a copy of it was given to plaintiff when she was employed. R. 50, 273. Therefore, plaintiff had access to the complaint procedure from the beginning of her employment. The Court in Rankin stated that "[i]n performing the balancing, the [speech] will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." Rankin, 483 U.S. at 388, 107 S.Ct. at 2898. In examining the manner, time, and place of the speech the court in Conaway v. Smith, 853 F.2d 789 (10th Cir.1988), noted that the plaintiff had used "less disruptive internal channels, rather than going outside the city administration. The relatively low key context in which [plaintiff] voiced his complaints further persuades us that the Pickering balance tilts in his favor." Conaway, 853 F.2d at 798. Therefore, in examining the manner of the speech, the court should consider whether the employee used internal complaint procedures.
 
 
 37
 Plaintiff initiated multiple outside contacts prior to using the internal complaint channels of the school.[6] Plaintiff's decision to contact outside agencies prior to using the complaint mechanism of the school was unnecessarily disruptive because there was no indication that the internal mechanism would not be sufficient. The adequacy of the internal mechanism is demonstrated by the School Board's eventual willingness to address the majority of plaintiff's concerns by adopting a new medication policy.
 
 III. Conclusion
 
 38
 Although plaintiff was addressing an important issue and genuinely held point of view regarding a matter of undeniable public interest, we hold that, on balance, her interests in making the particular speeches here involved is outweighed by the school district's interest in promoting the efficiency of its public services because of the manner, time and place which plaintiff used to express her viewpoint. Therefore, plaintiff's speech in its entirety was not constitutionally protected under the Pickering balance test.[7] It is therefore unnecessary to reach the last two prongs of the Mount Healthy test to determine whether the speech was a motivating factor in the non-renewal of plaintiff's contract, or whether the employer would have made the same decision even in the absence of the plaintiff's speech. Mount Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Similarly, it is unnecessary to reach the other issues raised in appellant's appeal, such as the refusal of the court to give an instruction on punitive damages. The district court's granting of a judgment notwithstanding the verdict in favor of the defendants is AFFIRMED.
 
 
 
 *
 The Honorable J. Smith Henley, Senior Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [1]
 Under Oklahoma law, a newly hired employee of the public schools is probationary for the first three years of his or her employment. Okla.Stat.Ann. tit. 70, § 6-102.1(4) (1989)
 
 
 [2]
 For example, § 567.3(2) defines "[t]he practice of professional nursing" to include "the administration of medications and treatments, as prescribed by a licensed physician or dentist." Okla.Stat.Ann. tit. 59, § 567.3(2) (1989) (emphasis added). After plaintiff's contract was not renewed, an Attorney General Opinion was issued stating that it is improper for nurses to distribute either prescription or non-prescription drugs without a doctor's authorization. Op. Att'y Gen. No. 83-133, 83-117 (Feb. 16, 1984). However, the Attorney General Opinion has no bearing on this case and was not considered by the district court when it found that Oklahoma law was "ambiguous" during the time plaintiff was voicing her concerns as to whether a physician's authorization was necessary for a school nurse to administer a non-prescription medication upon direction of a parent. Johnsen v. Independent School Dist., No. 85-C-54-B, at 5-6 (N.D.Okla.) (filed Oct. 22, 1986)
 
 
 [3]
 The question of whether speech is protected is determined under a balancing test found in Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Whether the speech is constitutionally protected is a question of law and should not be submitted to the jury. Wren v. Spurlock, 798 F.2d 1313, 1318 (10th Cir.1986), cert. denied, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987). However, submitting the question to the jury does not automatically require reversal. Id. An appellate court is not bound by the jury determination and is able to make an independent judgment concerning whether plaintiff's speech is protected. Jurgensen v. Fairfax County, 745 F.2d 868, 893 (4th Cir.1984) (dissenting opinion)
 
 
 [4]
 The balancing of factors under Pickering and Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), is at times difficult to apply to the many fact patterns which arise, because the court is required to balance apples and oranges: the First Amendment rights of the employee against the non-constitutional interest of government efficiency. In order to confirm the court's analysis under the Pickering balancing test, it may sometimes be helpful for the court to ask alternatively whether the public employee's speech was reasonable in light of the surrounding circumstances
 Reasonableness, as an objective standard, involves the same criteria as the Pickering balancing test but it provides the court with a more familiar framework to use in balancing the many factors under Pickering. To determine whether the speech is reasonable, and therefore protectable, the court can look first at the manner, form, and circumstances of plaintiff's speech. That is consistent with Connick, where the Court considered the "manner, time, and place" of the employee's speech. Connick, 461 U.S. at 152, 103 S.Ct. at 1692. Therefore, the court can look to when and where the speech took place and to whom the employee spoke.
 The court could also consider whether other avenues were available to the employee to express his or her concerns. For example, if the employee is speaking out against the corruption of his or her supervisors, it may be reasonable to forego the internal complaint mechanism of the department because it would be a futile gesture. Cf. Brockell v. Norton, 732 F.2d 664, 668 (8th Cir.1984) (allegations warranted going around normal chain of command). However, where an adequate internal complaint mechanism is established, the employee's failure to use the complaint procedure can be considered in determining whether the speech was reasonable.
 The seriousness of the issue of public concern should also be considered in determining whether the speech was reasonable. The more serious the issue, the greater latitude that should be given the public employee to speak out. Cf. Connick v. Myers, 461 U.S. 138, 152, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708 (1983) ("a stronger showing [by defendant] may be necessary if the employee's speech more substantially involved matters of public concern"); Conaway v. Smith, 853 F.2d 789, 797-98 (10th Cir.1988) (whistle blower exposing governmental corruption allowed greater latitude even though the speech results in disharmony).
 Another factor that could be considered by the court is the consequences of the public employee's speech. If the disruptions to the operations of the public employer are slight, the public employee's speech is more likely to be reasonable. Cf. Ware v. Unified School Dist., 881 F.2d 906, 910 (10th Cir.1989) (speech did not justify termination because "effective functioning of the office was not affected by [plaintiff's] speech"). In contrast, if the normal functioning of the government operation is brought to a halt, plaintiff's speech is more likely to be deemed unreasonable. A reasonableness analysis is applied to the facts of this case at note 7 of this opinion.
 
 
 [5]
 For example, plaintiff hired legal counsel and sought information from governmental agencies. R. 106, 133. Plaintiff spoke at the school board meeting where she made false accusations of indiscriminate administration of drugs. R. 155-156. Plaintiff continually discussed the medication policy in the monthly nurses meetings. R. 370. Also, plaintiff threatened a nurse that she would report her to the state board of nursing. R. 783
 
 
 [6]
 In Luethje v. Peavine School Dist. of Adair County, 872 F.2d 352 (10th Cir.1989), we held that a rule preventing employees from speaking to parties outside of the school about school concerns was improper. However, the court explained that "[g]uidelines for school employees' public comments might in some circumstances be permissible, but the broadly worded rule here covered more ground than was necessary to satisfy the school's interest in functioning efficiently." 872 F.2d at 356. Luethje demonstrates that an employee's right to speak to outside parties cannot be unreasonably restricted. However, in the present appeal, plaintiff was not prohibited from going to outside agencies but was merely advised to use internal complaint mechanisms. Also, her refusal to use effective internal complaint procedures was only one factor used in applying the manner, time, and place component of the Pickering balance
 
 
 [7]
 Applying the reasonableness standard, discussed supra note 4, to the facts before us, plaintiff's speech would similarly be held to be unprotected. Plaintiff's speech was unreasonable, and therefore unprotected, because of her false allegations, her continual dominance of the health service meetings, her disruptive threats to fellow nurses, and her failure to use the schools own complaint mechanism when there was no indication that resort to internal channels would be futile. Cast in the light of reasonableness, it is clear that plaintiff's speech was unnecessarily disruptive of the health service program of the school and therefore unreasonable