**Dr. Pamela J. WESTBROOK, Plaintiff,**

v.

**TETON COUNTY SCHOOL DISTRICT NO. 1; Sarah J. Smith, Superintendent of Public Instruction, in her individual and official capacities, Defendants.**

No. 95–CV–0156–B.

United States District Court,
D. Wyoming.

March 1, 1996.

Patrick E. Hacker, Terry L. Armitage, Cheyenne, Wyoming, for Plaintiff.

R. Michael Mullikin, Jackson, Wyoming, for Defendants.

### ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT AND PERMANENT INJUNCTION

BRIMMER, District Judge.

Dr. Pamela Westbrook, a special education teacher in Teton County School District No. 1 ("Teton County"), asks the Court to find that Teton County's "Staff Conduct" policy—which limits and restricts "criticism"—violates the First Amendment's guarantee of free speech. Teton County opposes Westbrook's motion for partial summary judgment and a permanent injunction primarily by arguing that its policy is constitutional because it restricts only "unprotected speech."

#### Background

In 1981, Teton County School District No. 1 enacted a "Staff Conduct" policy that re-

stricts and channels "criticism" among and between employees:

It shall be unethical for any staff member to criticize other staff members, the administrators, or members of the Board of Trustees to anyone other than the person being criticized[,] except to the Building Principal, Superintendent, or at a regular meeting of the Board of Trustees.

(Policy attached as Appendix "A"). To discourage staff members from making "critical" comments out of order, the policy also has an enforcement mechanism: "Continued disregard for this policy will result in disciplinary action."

For purposes of this order, the particular facts surrounding Westbrook's speech are not important. Suffice it to say that Westbrook filed this lawsuit shortly after Teton County allegedly disciplined her pursuant to its limited criticism policy. Although Westbrook challenges that policy as Teton County applied it to her, in this motion she challenges the policy only as it applies to all Teton County employees. In the lingua franca of constitutional law, she challenges the policy "on its face," alleging that it: (1) constitutes an invalid prior restraint on speech; (2) infringes on protected speech in the absence of a compelling state interest; and (3) is unconstitutionally vague and overbroad.

### Analysis

### I. TETON COUNTY'S POLICY AND THE LAW OF "PRIOR RESTRAINT"

 Westbrook first asserts that Teton County's policy is a constitutionally infirm "prior restraint on the First Amendment right of free speech." Although Westbrook is wrong, her error is a common one that seems to have arisen from careless and excessive use of the phrase "prior restraint."[1]

 Not all laws that burden speech are "prior restraints." Despite this historical fact, many people assume otherwise. Their misunderstanding apparently arises from the

chronologically obvious fact that any law which pre-exists speech, and which threatens to punish speech, tends to inhibit speech. Because such laws pre-exist or are "prior" to speech, and because such laws inhibit or "restrain" speech, one might conclude that such laws are "prior restraints." This colloquial conclusion is, however, wrong. It is wrong because the phrase "prior restraint" is a legal term of art that is shorthand for laws which do more than simply punish a person, after the fact, for saying certain things. *See Trotman v. Board of Trustees*, 635 F.2d 216, 229 (3d Cir.1980) (noting "vast difference" between prior restraint censorship and subsequent punishments); *Providence Journal Co. v. Newton*, 723 F.Supp. 846, 854 (D.R.I. 1989) (discussing difference between "prior restraints" and "subsequent punishments").

 As the Supreme Court uses the term, a law constitutes a prior restraint when: (1) A person who seeks to exercise First Amendment rights must apply to the government for permission; (2) The government is empowered to determine—on the basis of the content of the proposed expression—whether it should grant the applicant permission to speak; (3) Permission to speak depends on the government's affirmative action; and (4) Approval is not a routine matter, but requires the government to examine facts, exercise judgment, and form opinions. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975); *see Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). Most systems of prior restraint involve some kind of licensing scheme or permit process. *See, e.g., Freedman*, 380 U.S. at 58–59, 85 S.Ct. at 738–39; *Kunz v. New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951). Reduced to their lowest common denominator, true or classic prior restraints give "public officials the power to deny use of a forum in advance of actual expression."

---

**1.** In fact, the error is so common that some commentators have suggested that the doctrine of "prior restraint" no longer is useful as an independent category of First Amendment analy-

sis. *See* L. Tribe, *American Constitutional Law* 1040 (2d ed. 1988) (citing Jeffries, *Rethinking Prior Restraint*, 92 Yale L.J. 409, 437 (1982)).

*Id.* at 553, 95 S.Ct. at 1244. None of these elements apply in this case.

First, Teton County's policy does not require employees to apply for permission before they "criticize" colleagues or superiors. Second, the policy does not authorize the district to examine the content of employees' proposed speech before determining whether they can speak. Third, employees do not have to await Teton County's approval before they speak. And finally, the policy does not require Teton County to examine the "prespeech" facts, exercise its judgment, and decide whether to allow or prohibit the proposed speech.

Although Teton County's threat of subsequent disciplinary action may chill employee speech, it does not freeze employee speech before it is aired. Teton County's policy simply does not give Teton County officials the power to deny the use of a forum in advance of actual expression. Teton County's policy is not, therefore, a constitutionally suspect "prior restraint."

## II. TETON COUNTY'S POLICY, THE COMPELLING INTEREST TEST, AND THE *PICKERING* BALANCING TEST

Westbrook next argues that Teton County's policy violates the First Amendment because, for no compelling reason, it restricts speech. In support of this argument, Westbrook asserts that she must prevail because Teton County has failed to articulate and demonstrate a compelling state interest that justifies its content-based restriction on speech.

### A. The Compelling State Interest Test

■ When government restricts, on the basis of content, the free speech rights of private citizens, it usually must demonstrate that: (1) it has a compelling state interest in promoting some interest served by the speech restriction; (2) the law restricting speech directly furthers the government's interest; and (3) the law restricting speech is no more broad than necessary to further the government's interest. *Carey v. Brown,* 447 U.S. 455, 465, 100 S.Ct. 2286, 2292–93, 65 L.Ed.2d 263 (1980); *Perry Educ. Ass'n v.*

*Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983); *Boos v. Barry,* 485 U.S. 312, 321–24, 108 S.Ct. 1157, 1163–66, 99 L.Ed.2d 333 (1988). "This is," the Supreme Court recently observed, "an exacting test." *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. ——, ——, 114 S.Ct. 2445, 2478, 129 L.Ed.2d 497, 541 (1994) (O'Connor, J., concurring in part and dissenting in part). Thus, if this were a case in which the government had enacted a law that allowed one citizen to "criticize" another citizen only under limited circumstances, the Court would rigorously require the government to satisfy these three criteria. This is not, however, such a case.

■ The issue here is whether Teton County can regulate the speech of its employees, not whether it can regulate the speech of private citizens. The First Amendment test for evaluating restrictions on the speech of private citizens is different from the test for evaluating restrictions on the speech of public employees. *Waters v. Churchill,* 511 U.S. ——, —— – ——, 114 S.Ct. 1878, 1886–88, 128 L.Ed.2d 686, 697–99 (1994) (plurality opinion). Although the First Amendment protects the speech rights of public employees, the protection is not so stout that it requires the government to proffer a compelling interest which justifies a narrowly tailored restriction on such speech.

### B. The *Pickering* Balancing Test

■ In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court set forth the First Amendment test that applies to the speech of public employees. Noting that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general," the Court held that:

> The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35. Over the years, the Court has refined this balancing test, *see Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), so that it now requires courts to consider first whether the speech at issue addresses a matter of "public concern." *Luethje v. Peavine School District,* 872 F.2d 352, 355 (10th Cir. 1989); *Conaway v. Smith,* 853 F.2d 789, 796 (10th Cir.1988). If the employee's speech does not address an issue of public concern, the Court does not even proceed to the next step, which is the balancing. *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689–90.

### 1. Speech on Matters of "Public Concern"

 Addressing the "public concern" requirement in *Connick,* the Court commented that "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." 461 U.S. at 146, 103 S.Ct. at 1690. Employee speech addresses matters of public concern if, considering its entire "content, form, and context," it relates "to any matter of political, social, or other concern to the community." *Id.* at 146–48, 103 S.Ct. at 1690.

 Given this expansive definition of "public concern," some courts have held that speech concerning educational theories and practices is inherently a matter of public concern. As the Eighth Circuit aptly has observed, "[t]he question of what constitutes the proper care and education of children is one of the most frequently debated issues in the public forum. In this century some of the great public debates can be found to focus on the classroom." [2] *Bowman v. Pulaski County Special School Dist.,* 723 F.2d 640, 644 (8th Cir.1983). Similarly, in *Cox v. Dardanelle Public School Dist.,* 790 F.2d 668, 673 (8th Cir.1986), the court noted that "[t]he questions how we teach the young,

what we teach them, and the environment in which we teach them are of the most central concern to every community in the nation." Although this unfortunately overstates the case about the paramount concerns of communities today, this Court and the Tenth Circuit agree that "generally, speech by a public school employee about a policy or practice which can substantially and detrimentally affect the welfare of the children attending the school constitutes speech on a matter of public concern." *Morfin v. Albuquerque Public Schools,* 906 F.2d 1434, 1437–38 (10th Cir.1990).

### 2. Balancing the *Pickering* Factors

 If the Court finds as a threshold matter that Westbrook's speech addresses a matter of public concern, it will then perform the *Pickering* balancing test. *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91. This test weighs the interest of the public employee, as a citizen, in commenting on matters of public concern, against the interest of the government, as an employer, in promoting effective and efficient public service. *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35. On one side of the scale, the Court places the government's presumably weighty interest in workplace effectiveness and efficiency. On the same or other side of the scale, the Court considers whether the speech: (1) impaired discipline by superiors or harmony among co-workers; (2) had a detrimental impact on close working relationships for which personal loyalty and confidence are necessary; (3) impeded the performance of the employee's duties or interfered with the regular operation of the enterprise; and (4) was aired in an inappropriate time, place, or manner. *Connick,* 461 U.S. at 150–54, 103 S.Ct. at 1691–94; *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899. In addition, the Tenth Circuit has assigned non-specific weights to the "truth or falsity" of the speech, *Wulf v. Wichita,* 883 F.2d 842, 858 (10th Cir.1989), and the value of the speech to public discourse. *Ware v. Unified School District, No. 492,* 881 F.2d 906, 910 (10th Cir.1989).

---

**2.** These issues have aroused great debates not only in this century, but in others as well. *See The Republic of Plato* (A. Bloom trans., 1968);

Jean Jacques Rousseau, *Emile* (W. Boyd ed. and trans., 1956) (1762); John Dewey, *Lectures in the Philosophy of Education: 1899* (1966).

When assessing the latter consideration—the value of speech to public discourse—the Court will give some additional weight to the fact that "[t]eachers are, as a class, the members of a community most likely to have informed and definite opinions" about matters affecting the schools. *Pickering*, 391 U.S. at 572, 88 S.Ct. at 1736. Teachers, therefore, should have an important voice in the debate over educational matters ranging from curriculum to discipline. *See Piver v. Pender County Bd. of Educ.*, 835 F.2d 1076, 1080 (4th Cir.1987); *cf. Ambach v. Norwick*, 441 U.S. 68, 75–80, 99 S.Ct. 1589, 1593–96, 60 L.Ed.2d 49 (1979) (discussing importance of teachers to education and democracy).

Although there are additional glosses on the *Pickering* balancing test, *see Johnsen v. Independent School Dist. No. 3 of Tulsa County*, 891 F.2d 1485, 1490–94 (10th Cir. 1989); *Luethje*, 872 F.2d at 355; *Conaway*, 853 F.2d at 797; *Piver*, 835 F.2d at 1078–80; *Bowman*, 723 F.2d at 644–45, the Court need not address those at this time. At this stage of the proceedings, Westbrook does not challenge the policy as Teton County applied it to her. To challenge Teton County's policy as applied (rather than on its face), Westbrook will have to present specific facts in support of her claim. Until the parties have developed and presented the facts, the Court cannot weight the *Pickering* balance to determine if Teton County violated Westbrook's First Amendment rights by punishing her for speaking as she did. *See Brockell v. Norton*, 732 F.2d 664, 667 (8th Cir.1984) (*Pickering* balancing "relies heavily upon the facts of each individual case").

## III. UNCONSTITUTIONAL OVERBREADTH AND VAGUENESS

Westbrook further contends that Teton County's policy is unconstitutional because it is "overbroad" and "vague."

Although not widely recognized as such, the doctrines of "overbreadth" and "vagueness" are independent (though related) categories of First Amendment analysis. *Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 2561–62, 41 L.Ed.2d 439 (1974); L. Tribe, *American Constitutional Law* at 1033.

These doctrines are unique because they cut across, and can be used in conjunction with, most other First Amendment doctrines. Stated differently, courts may properly use overbreadth or vagueness analysis where the facts of the case—i.e., the speaker, the speech, and the forum—also require the court to apply other First Amendment categories of analysis.

For instance, a court may classify the case before it as one involving "prior restraints," "content-based" restrictions, "facially neutral" restrictions, "forum" restrictions, or "time, place, and manner" restrictions. Alternatively or simultaneously, the court also may classify the case as one which calls into play specific First Amendment doctrines built around obscenity, defamation, incitements, fighting words, commercial speech, symbolic expression, political campaigns, or public employment. Regardless of how the court classifies the case, the court also might be able to apply the doctrines of "overbreadth" and "vagueness." Unfortunately, this doctrinal versatility sometimes causes courts, counsel, and commentators to mesh these doctrines and confuse their analyses, so it is difficult to determine the precise grounds upon which a court should decide (or has decided) the case. To avoid such confusion, this Court will consider these doctrines separately.

### A. Overbreadth

The First Amendment prevents government from punishing "the use of words or language not within 'narrowly limited classes of speech'." *Gooding v. Wilson*, 405 U.S. 518, 521–22, 92 S.Ct. 1103, 1106, 31 L.Ed.2d 408 (1972) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942)). To ensure that the government punishes only these narrowly limited classes of speech (such as obscenity, defamation, incitements, perjury, fraud, etc.) and no others, government must draw a "fine line" between "speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished...." *Speiser v. Randall*, 357 U.S. 513, 525, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460

(1958).[3] Statutes, therefore, "must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." *Gooding,* 405 U.S. at 522, 92 S.Ct. at 1106.

 Such precision is necessary because laws that ostensibly regulate only unprotected speech may, as a result of sweeping language or imprecise words, have a spillover effect. These kinds of laws restrict not only unprotected speech, but also restrict protected speech. These kinds of laws are, in a sense, too effective. They cause would-be speakers to check their speech for fear that it might be caught up in the prohibitive sweep of an overbroad law. To avoid this so-called "chilling" effect on expression, the Supreme Court requires precision in drafting: "First Amendment freedoms need breathing space to survive"; therefore, "government may regulate [speech] only with narrow specificity." *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963).

 Laws regulating speech must be specific because "the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted...." *Bates v. State Bar of Arizona,* 433 U.S. 350, 380, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977). The gravity of this possible harm is such that the Supreme Court has altered its traditional rules on standing (which do not allow litigants to assert others' rights) to allow facial attacks on overly broad statutes:

> Although a statute may be neither vague, overbroad, nor otherwise invalid as applied to the conduct charged against a particular defendant, he is permitted to raise its vagueness or unconstitutional overbreadth as applied to others. And if the law is found deficient in one of these respects, ... [t]he statute, in effect, is stricken down on its face. This result is deemed justified since the otherwise continued existence of the statute in unnarrowed form would tend to suppress constitutionally protected rights.

*Coates v. Cincinnati,* 402 U.S. 611, 619–20, 91 S.Ct. 1686, 1691, 29 L.Ed.2d 214 (1971) (White, J., dissenting) (citations omitted); *Secretary v. Joseph H. Munson, Co.,* 467 U.S. 947, 958, 104 S.Ct. 2839, 2847–48, 81 L.Ed.2d 786 (1984) (facial challenges to overbroad statutes allowed not for litigant's benefit but for society's benefit).

Given these relaxed rules of standing, and a test that requires courts to identify the ways in which a possibly overbroad law might restrict protected speech, the Supreme Court appropriately has characterized the overbreadth doctrine as "strong medicine" that, if overused, could transform courts into "roving commissions assigned to pass judgment on the validity of the Nation's laws." *Broadrick v. Oklahoma,* 413 U.S. 601, 610–13, 93 S.Ct. 2908, 2915–16, 37 L.Ed.2d 830 (1973). The Supreme Court's reluctance to strike down otherwise valid laws using this doctrine eventually led to "less exacting" overbreadth scrutiny when the law at issue regulated conduct primarily and speech incidentally. *Broadrick,* 413 U.S. at 615, 93 S.Ct. at 2918. This "less exacting" scrutiny meant that in cases involving laws aimed primarily at conduct, the overbreadth had to be "real" and "substantial." *Id.* Even so, the scrutiny remained strict (and often fatal) when the allegedly overbroad law regulated speech only. Thus, if a law aimed directly at speech punished not only unprotected speech, but also spilled over and punished protected speech, it was overbroad and unconstitutional. *Gooding,* 405 U.S. at 520, 92 S.Ct. at 1105 (law punishing words can withstand facial attack only if it does not apply to protected speech); *Grayned v. City of Rockford,* 408 U.S. 104, 114–15, 92 S.Ct. 2294, 2302–03, 33 L.Ed.2d 222 (1972) (crucial question is whether law punishes protected speech).

 As the Supreme Court's reluctance to wield the overbreadth scythe increased, the Court further restricted its use by importing the *Broadrick* standard into cases involving laws aimed directly at First Amendment activities. *See Board of Airport Com'rs of Los Angeles v. Jews for Jesus,* 482

---

3. For a graphic illustration of speech that is unconditionally guaranteed and speech that is

not, see W. Van Alstyne, *Interpretations of the First Amendment,* 21–49 (1984).

U.S. 569, 574, 107 S.Ct. 2568, 2571–72, 96 L.Ed.2d 500 (1987). Therefore under the current overbreadth regime, Westbrook must demonstrate that Teton County's policy is "realistically" and "substantially" overbroad. *Broadrick*, 413 U.S. at 615, 93 S.Ct. at 2917–18; *Jews for Jesus*, 482 U.S. at 574, 107 S.Ct. at 2571–72.[4] As a practical matter, this means Westbrook must show that "a substantial number of instances exist in which the [policy] cannot be applied constitutionally." *New York State Club Ass'n v. New York*, 487 U.S. 1, 14, 108 S.Ct. 2225, 2234–35, 101 L.Ed.2d 1 (1988).

■ Westbrook's facial overbreadth attack ultimately requires this Court to examine Teton County's policy with a view toward predicting, hypothetically, whether it restricts protected speech in addition to unprotected speech. *Broadrick*, 413 U.S. at 612, 93 S.Ct. at 2916 (overbreadth analysis requires "a judicial prediction or assumption"); *see also Coates*, 402 U.S. at 616, 91 S.Ct. at 1689 (finding law overbroad without benefit of factual record). If the Court finds there is a real and substantial danger that the policy punishes not only unprotected speech but also protected speech, it will invalidate the policy because its overbreadth violates the First Amendment.

### (1) The Relationship Between Overbreadth Analysis and *Pickering* Balancing

■ The first step in overbreadth analysis is to differentiate between "unprotected speech" and "protected speech." Because this case involves the First Amendment rights of public employees, the proper test for classifying speech as "unprotected" or "protected" is the *Pickering* balancing test. The *Pickering* calculus requires facts. It also requires balancing. When the facts change, the balance changes. Given this factually intensive balancing procedure, no one can definitively conclude—before an employee has spoken—whether an employee's incipient speech is protected or unprotected. Commenting on this fact in *Pickering*, the

Supreme Court observed that there is no general test by which to measure the incipient speech of public employees "[b]ecause of the enormous variety of fact situations in which critical statements by teachers ... may be thought by their superiors ... to furnish grounds for [discipline]." *Pickering*, 391 U.S. at 569, 88 S.Ct. at 1735. The best that anyone can do is guess that certain types of speech, delivered in certain types of contexts, will probably be protected or unprotected.

■ Despite the fact that it is not possible to engage in *Pickering* balancing before an employee has spoken, Teton County asserts that its Staff Conduct policy punishes only unprotected speech. Teton County therefore asserts (albeit implicitly) that its policy is drawn so precisely that it properly resolves the *Pickering* balance before its employees have even expressed themselves. If Teton County's policy actually does so, it means that the policy anticipates the countless factual variables which go into the calculus and correctly resolves *Pickering*'s protected/unprotected speech equation every time. Such ex ante balancing demands an omniscience that Teton County, and this Court, lack.

Furthermore, if this Court accepts Teton County's argument that its policy punishes only unprotected speech, it also would have to accept Teton County's conclusion that all "criticism" is unprotected speech. It does not take a First Amendment scholar to know that this cannot be so. Justice Frankfurter, who was such a scholar, declared decades ago that citizens cannot be punished for criticizing: "One of the prerogatives of American citizenship is the right to criticize public men and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation." *Baumgartner v. United States*, 322 U.S. 665, 674, 64 S.Ct. 1240, 1245, 88 L.Ed. 1525 (1944). This does not mean, of course, that citizens have an unfettered right to criticize. Under certain circumstances, criticism

---

4. In *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801, 104 S.Ct. 2118, 2126–27, 80 L.Ed.2d 772 (1984), the Court used the adjective "significant" rather than "substantial." This Court does not find a legally significant or substantial difference between the two adjectives.

may be unprotected and result in punishment.

If criticism is defamatory, the speaker may have to pay damages. If criticism is obscene, the speaker may have to pay a fine. If criticism is an incitement, the speaker may have to spend time in jail. Criticism, in other words, is not always protected speech. By the same token, criticism is not always unprotected speech. But determining whether criticism is protected or unprotected depends on the facts of each case. This is especially true when the criticism comes from a public employee.

This Court, therefore, must examine the policy to determine if it correctly balances—in each and every possible case—the competing interests at stake between Teton County as employer and its employees as citizens.

### (2) Teton County's Policy and Overbreadth Analysis

Teton County's policy flatly threatens punishment for any staff members who "criticize" other staff members, administrators, or trustees to anyone other than: (1) "the person being criticized"; (2) the building principal; or (3) the superintendent of schools. The only exception to this policy is that a staff member can air such "criticisms" at a "regular meeting of the Board of Trustees." The policy does not define "criticism."

 Before deciding at step two whether Teton County's policy is so broad that it impermissibly punishes protected speech, the Court thinks it best to decide at step one whether the policy is so precise that it permissibly punishes only unprotected speech. Put another way, the Court begins its analysis by asking whether Teton County's policy precisely cordons off an identifiable zone of unprotected speech and punishes only that expression which falls within the zone. If there is no such zone, or no core of "easily identifiable and constitutionally proscribable conduct" to which the policy applies, *Munson*, 467 U.S. at 965–66, 104 S.Ct. at 2851–52, the policy probably is overbroad.

On its face, Teton County's policy fails to differentiate between "criticism" that is unprotected speech and "criticism" that is protected speech. It simply punishes all "criticism" that is not delivered in the prescribed manner. Although "critical" speech ultimately may be unprotected because it "fall[s] within those relatively few categories" of speech that receive little or no First Amendment protection (such as defamation, obscenity, profanity, etc.), *Cohen v. California*, 403 U.S. 15, 19–22, 91 S.Ct. 1780, 1785–87, 29 L.Ed.2d 284 (1971), Teton County's policy does not single out these particular species of "criticism" for punishment. Nor does Teton County's policy purport to weigh the value of an employee's "critical" speech on matters of public concern against the district's interest in running efficient and effective schools. Blanket restrictions on "criticism" simply do not differentiate between protected and unprotected speech, and do not punish only unprotected speech. Here, there is no zone of unprotected speech that Teton County has carefully cordoned off and to which the policy applies.

Lacking any boundary between protected and unprotected speech, Teton County's policy does not merely spill over into the realm of protected speech; it inundates that realm. Although it is not difficult to envision the many hypothetical instances in which Teton County's policy could operate to punish constitutionally protected speech, this Court will not trot out the overused "parade of horribles" to do so. Instead, the Court will examine briefly a number of cases in which other courts have held that public employee speech is protected. In each of these cases (most of which involve public school teachers), the Court can confidently say that Teton County's Staff Conduct policy could or would have punished the speech, despite the fact that other courts—applying the *Pickering* balancing test—have held that such speech is protected.

The Court begins its survey with *Pickering v. Board of Education*, 391 U.S. at 566–67, 88 S.Ct. at 1733–34, a case in which the local school board fired a teacher (Pickering) for sending a letter to the local newspaper in connection with recently proposed tax increases. Pickering's letter was "critical" of the way in which the board and the superintendent of schools had handled past propos-

als to raise new revenue for the schools. *Id.* Although the Supreme Court held that Pickering's speech was constitutionally protected, *id.* at 574, 88 S.Ct. at 1737–38, Teton County—applying its overbroad Staff Conduct policy—presumably would have concluded that Pickering's "critical" speech was unprotected.

In *Lewis v. Harrison School Dist. No. 1,* 805 F.2d 310 (8th Cir.1986), the local school board discharged one of its principals after he criticized the superintendent of schools' handling of personnel matters. Before concluding that the principal's speech was protected, the Eighth Circuit observed that "[s]peech is not unprotected under the Constitution just because it is critical, even when its criticism is bluntly worded and directed at specific governmental officials." *Id.* at 316. Despite this result, Teton County presumably would have found that under its policy the principal's "critical" speech was unprotected.

In *Cox v. Dardanelle Public School Dist.,* 790 F.2d 668 (8th Cir.1986), the local school board refused to renew a teacher's contract after the teacher publicly criticized, on many occasions, her principal's methods, policies, and practices. Before finding that the teacher's speech was protected, the Eighth Circuit noted that it "was legitimate criticism. of policies and administration which affected the educational function of the school." *Id.* at 673–74. Applying its policy under the same circumstances, Teton County undoubtedly would have found that the teacher's speech was illegitimate and unprotected.

In *Rampey v. Allen,* 501 F.2d 1090 (10th Cir.1974), college administrators fired a number of professors after they made public comments that the college president considered "critical" and "divisive." *Id.* at 1095–97. Noting that the professors were fired after "exercising their right . . . to criticize the administration of the school," the Tenth Circuit held that the professors' speech was protected. *Id.* at 1096. Teton County apparently would have applied its policy to reach a different result.

In *Bowman v. Pulaski County Special School Dist.,* 723 F.2d 640 (8th Cir.1983), the school board punished two teachers after the teachers made public comments about an incident involving the corporal "paddling" of students. The teachers had discussed the incident with parents, made public statements about the severity of the paddling, and stated that the teacher involved should be disciplined. Despite the fact that "[t]he incident drew a considerable amount of press coverage, caused some turmoil in the community, and [was] blamed for dividing a previously harmonious faculty and student body," the Eighth Circuit held that the teachers' speech was protected. *Id.* at 642. Teton County School District, applying its policy, surely would have come to a different conclusion.

In *Piver v. Pender County Bd. of Educ.,* 835 F.2d 1076 (4th Cir.1987), the school board punished and reprimanded a teacher after he publicly spoke on behalf of a principal whose contract was up for renewal. After the board decided not to renew the principal's contract, it found that the teacher's public comments on the issue had been "divisive and disruptive." *Id.* at 1078. Although the Fourth Circuit held that the teacher's speech was protected, Teton County presumably would have determined that his speech was unprotected.

In *Knapp v. Whitaker,* 757 F.2d 827 (7th Cir.1985), the school board punished a teacher for speaking and writing to board members about what he perceived to be inequitable mileage allowances for coaches, inadequate liability insurance coverage for coaches, and a deficient grievance procedure for teachers. After suggesting that the teacher's speech constituted "constructive criticism," the Seventh Circuit held that the teacher's speech was protected. *Id.* at 840, 843. For its part, Teton County presumably would have found that the teacher's speech was unprotected.

In *Starsky v. Williams,* 353 F.Supp. 900 (D.Ariz.1972), the board of regents discharged a university professor after he publicly characterized the board as hypocritical, questioned the board's motives, and criticized the university administration. After noting the severity of his criticism and engaging in *Pickering* balancing, the court held that "the

kinds of criticism involved in each of these speeches under the circumstances in this case are completely protected." *Id.* at 924. Again, Teton County surely would have applied its policy to reach a different result.

Although the Court could discuss many more cases in which Teton County's policy would or could have been used to punish speech that the courts have determined is protected,[5] it need not do so. This relatively brief survey amply demonstrates not only that Teton County's policy is overbroad, but also that it is "realistically" and "substantially" overbroad. *Broadrick*, 413 U.S. at 615, 93 S.Ct. at 2917–18; *Taxpayers for Vincent*, 466 U.S. at 801, 104 S.Ct. at 2126–27. There are, in other words, a substantial number of instances in which Teton County could not, consistent with the First Amendment, apply its policy. *New York State Club Ass'n*, 487 U.S. at 14, 108 S.Ct. at 2234–35.

While much of the policy's overbreadth arises from the fact that not all "criticism" is unprotected speech, part of its overbreadth stems from Teton County's use of an exceedingly imprecise word to regulate speech: "criticism." This word, in turn, leads the Court to consider Westbrook's contention that Teton County's policy is void because it is overly vague.

### B. Void for Vagueness

In a country founded on law rather than dictate, laws must be clear. Vague laws create several problems, each of which has the potential to wreak havoc on the Constitution. *See Grayned*, 408 U.S. at 108–09, 92 S.Ct. at 2298–99. The first problem stems from our collective belief in freedom of choice. We believe, in other words, that people are free to choose between lawful and unlawful conduct. People cannot make this choice if, because of vague laws, they cannot identify the boundary between the lawful and the unlawful.

The second problem arises from the fact that we empower certain people—namely, police, prosecutors, judges, and juries—to enforce and administer the law in a principled way. As Lewis Carroll has colorfully taught us, these principles tend to disintegrate when words become elastic:

> "When I use a word," Humpty Dumpty said, in a rather scornful tone, "it means just what I choose it to mean—neither more nor less."
>
> "The question is," said Alice, "whether you can make words mean so many different things."
>
> "The question is," said Humpty Dumpty, "which is to be master—that's all."

L. Carroll, *Alice in Wonderland* 163 (D. Gray ed., 1971). To prevent those whom we entrust to enforce and administer laws from becoming "masters," we bind them with clearly defined laws.

The final problem with vague laws is that when they are directed toward or impinge upon the seminal right of speech, people stop speaking. *See Thomas v. Collins*, 323 U.S. 516, 535, 65 S.Ct. 315, 325, 89 L.Ed. 430 (1945). They do so because they cannot determine whether their speech is legal or illegal.[6] Or, perhaps worse than not speaking at all, people utter only the most innocuous banalities that they know will not be ensnared in the punitive web of a vague law.

---

**5.** *See, e.g., Copp v. Unified School Dist. No. 501*, 882 F.2d 1547, 1551–53 (10th Cir.1989) (janitor's public criticism of school board decision is protected); *Ware*, 881 F.2d at 908–10 (school secretary's criticism of bond proposal is protected); *Rankin v. Independent School Dist. No. I–3*, 876 F.2d 838, 842–44 (10th Cir.1989) (teacher's public criticism of school's discipline policy is protected); *Luethje*, 872 F.2d at 353, 356 (school cook's public criticism of cafeteria sanitation is protected); *Wren v. Spurlock*, 798 F.2d 1313, 1318 (10th Cir.1986) (teacher's public letter critical of superintendent's performance is protected); *Anderson v. Central Point School Dist. No. 6*, 746 F.2d 505, 506–07 (9th Cir.1984) (teacher's public letter concerning athletic program is pro-

tected); *Trotman*, 635 F.2d at 225 (teacher's public criticism of school president is protected); *Simineo v. School Dist. No. 16*, 594 F.2d 1353, 1356–57 (10th Cir.1979) (per curiam) (teacher's criticism of superintendent's teaching methods is protected); *Lusk v. Estes*, 361 F.Supp. 653, 664 (N.D.Tex.1973) (teacher's criticism of school and students is protected).

**6.** Describing this phenomenon in *Keyishian v. Board of Regents*, 385 U.S. 589, 601, 87 S.Ct. 675, 682–83, 17 L.Ed.2d 629 (1967), the Supreme Court observed that "the uncertainty as to the scope of [a vague law's] proscriptions make it a highly efficient in terrorem mechanism."

■■■■ For these reasons, "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned*, 408 U.S. at 108, 92 S.Ct. at 2298. A law is unconstitutionally vague when it subjects the exercise of constitutional rights to "unascertainable standard[s]." *Coates*, 402 U.S. at 614, 91 S.Ct. at 1688. Although a law need not be drafted with absolute precision, people of "common intelligence" should not have to "guess at its meaning." *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). This is especially true where the law restricts speech, our bedrock freedom. *Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974); *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976).

■■■ In this case, people of common (and even uncommon) intelligence necessarily have to guess at the meaning of "criticism." "Criticism" is, of course, an inherently imprecise term. Webster's variously defines "criticism" and "to criticize" as:

(1) faultfinding disapproval and objection;

(2) a subtle point or fine distinction;

(3) the art of evaluating or analyzing, with knowledge and propriety, values or hypotheses;

(4) to consider and estimate worth or value;

(5) to find fault, errors, or demerits; and

(6) to consider merits and demerits and judge accordingly.

*Webster's Third New International Dictionary* 538 (1971).[7] One need not be a language theorist in the tradition of structuralism or semeiotics to discern that the term "criticism" is indefinite, fluid, and contingent. Although these infirmities might not be significant enough to invalidate a statute that (a) is directed at conduct only, and (b) has been authoritatively construed and narrowed by a state court, *Gooding*, 405 U.S. at 520, 92

S.Ct. at 1105, Teton County's policy satisfies neither of these conditions. It is a content-based speech restriction that no Wyoming state court has authoritatively construed and narrowed. *See Grayned*, 408 U.S. at 110, 92 S.Ct. at 2300 (federal courts cannot construe and narrow state laws). As such, this Court finds that Teton County's policy is, for constitutional purposes, too vague.

In reaching this conclusion, the Court need not rely on the unremarkable proposition that all linguistic endeavors involve interpretation and are to a certain degree subjective. *See generally* Glanville Williams, *Language and the Law*, 61 Law Q.Rev. 71 (1945). The Supreme Court has long understood that "[w]ords inevitably contain germs of uncertainty," *Broadrick*, 413 U.S. at 608, 93 S.Ct. at 2913, and that "we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110, 92 S.Ct. at 2300. Moreover, keen legal minds (especially those informed by modern literary theory[8]) will always be able to "conjure up hypothetical cases in which the meaning of [disputed] terms" will be thrown into doubt. *American Communications Ass'n v. Douds*, 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950). Despite these facts, we can expect—and the law demands—some certainty. As members of an interpretive community, one way in which we give words meaning is by agreeing on definitions. Sometimes the degree of agreement is small because the word is large. By "large," the Court means that some words are more complex and variable than other words. That is the case here.

"Criticism" is a complex and variable word. It can mean many things to many people. In fact, it can mean so many things to so many people that it is too vague for use in an enactment that regulates speech. Speech that is "criticism" to some is not "criticism" to others. Thus, Teton County's policy is not one which "requires a person to conform his [speech] to an imprecise but comprehensible

---

7. In addition to these dictionary definitions, "criticism" has acquired a specialized meaning in the field of literature. *See* Matthew Arnold, *Essays in Criticism* (First Series, 1865; Second Series, 1888); *Merriam–Webster's Encyclopedia of Literature* 284 (1995).

8. *See* Ferdinand de Saussure, *Course in General Linguistics* (1916); J.L. Austin, *How to Do Things with Words* (1962); Terry Eagleton, *Literary Theory: An Introduction* (1983); Stanley Fish, *Is There a Text in This Class? The Authority of Interpretive Communities* (1980).

normative standard," but rather is one that fails to specify any standard at all. *Coates*, 402 U.S. at 614, 91 S.Ct. at 1688. Before they speak, Teton County employees cannot determine whether the authorities will discipline them because their speech constitutes "criticism." Because Teton County's policy fails to provide employees with "fair warning" as to what can and cannot be said, *Grayned*, 408 U.S. at 108, 92 S.Ct. at 2299, and because it does not establish minimal guidelines to govern officials who enforce the policy, *Smith*, 415 U.S. at 574, 94 S.Ct. at 1247-48, its deterrent effect on protected speech is both "real and substantial." *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 60, 96 S.Ct. 2440, 2447, 49 L.Ed.2d 310 (1976). The First Amendment does not tolerate this in terrorem effect; therefore, the policy must fall.

## IV. FREE SPEECH DOCTRINE IN ACADEMIC SETTINGS

 Westbrook also argues that the First Amendment affords heightened protection to speech which addresses academic matters or is aired in an educational setting. In support of this broad-brush argument, Westbrook relies heavily on the Supreme Court's well-known statement in *Tinker v. Des Moines*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969), that neither students nor teachers "shed their constitutional rights of freedom of speech or expression at the schoolhouse gate." [9] Although it generally is true that teachers do not shed these rights at the schoolhouse gate, this does not mean that by passing through this gate teachers are clothed with First Amendment rights in addition to those they enjoy purely as public citizens.

Nonetheless, it is not hard to agree with the general proposition that speech should be particularly free in the schools. As an ideal toward which this society aspires, schools are places where students learn not only reading, writing, and arithmetic, but also learn how to think critically. Indeed, some would argue that the ability to think critically—here, the

Court uses the word "critically" in its broadest sense (i.e., "the art of evaluating or analyzing")—underlies the ability to read, write, and factor. Just as critical thought is essential to reading, writing, and factoring, it is equally true that free speech is essential to critical thought. Knowing this, the Supreme Court often has stated that schools in particular should provide sanctuary for free speech. Many of these statements—all of which are dicta—also appear to spring from the Court's recurring frustration with a corollary to Lord Acton's axiom: those with power tend to suppress speech.

One of the first such statements came in *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943), a case in which the Court noted the importance of preserving freedom in the classroom: "That [school boards] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." The Court took a similar stance in *Shelton v. Tucker*, 364 U.S. 479, 486, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960), when it noted that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." In *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1211-12, 1 L.Ed.2d 1311 (1957), the Court ventured beyond "scrupulous" and "vigilant" protection of freedoms to observe that schools are unique settings where free speech is especially important:

> Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

Continuing in this vein, the Court in *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683-84, 17 L.Ed.2d 629 (1967), declared:

---

**9.** Westbrook also cites *Doe v. University of Michigan*, 721 F.Supp. 852 (E.D.Mich.1989), in support of this proposition.

Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.

To ensure that such a pall does not descend upon the free speech rights of students, the Court in *Tinker* stated that First Amendment rights should "be applied in light of the special characteristics of the school environment." 393 U.S. at 506, 89 S.Ct. at 736.

Although it is not clear just what these "special characteristics" are, two circuits apparently have relied on this array of dicta—and the holding in *Tinker*—to fashion a First Amendment test that applies generally to "cases dealing with academia." *Trotman*, 635 F.2d at 230. In *Trotman*, the Third Circuit declared that "[i]n an academic environment," suppression of speech or opinion cannot be justified by an " 'undifferentiated fear or apprehension of disturbance'," or by " 'a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint'." *Id.* (quoting *Tinker*, 393 U.S. at 508–09, 89 S.Ct. at 737–38). With these general propositions from *Tinker* in mind, the *Trotman* court concluded that government can impose restraints on protected speech only if it shows that the speech would "materially and substantially interfere with the requirement of appropriate school discipline in the operation of the school." *Id.*

Following the same path (and apparently relying on the same authorities), the Ninth Circuit has stated that "[t]he desire to maintain a sedate academic environment . . . is not an interest sufficiently compelling . . . to justify limitations on a teacher's freedom to express himself on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms." *Adamian v.*

*Jacobsen*, 523 F.2d 929, 934 (9th Cir.1975). Voicing disdain for sedate academic environments, the *Adamian* court concluded that the state can regulate protected speech only where it "involves substantial disorder or invasion of the rights of others." *Id.* (quoting *Tinker*, 393 U.S. at 513, 89 S.Ct. at 740).

As is evident, the Third and Ninth Circuit "academic speech" tests—both of which require government to show that the speech in question substantially disrupted the school—provide "academic" speakers with greater protection than do the other tests that courts normally use to evaluate school speech (i.e., the *Pickering* balancing, "time, place, and manner," and "public forum" tests). As much as this Court might like to agree with these circuits and provide more protection for academic speech, it cannot do so. Neither the Supreme Court's pedagogical dicta nor the holding in *Tinker* support such a result.

■ To begin with, the Supreme Court's dicta is simply that: opinions offered "by the way" which do not embody the Court's holding. *Black's Law Dictionary* 408–09 (5th ed. 1979). Moreover, the Third and Ninth Circuits have overlooked the fact that the Court's decision in *Tinker* addresses the free speech rights of students, not the free speech rights of teachers. *Tinker*, 393 U.S. at 512–13, 89 S.Ct. at 739–40 (addressing "[a] student's rights"). The *Tinker* test, therefore, cannot properly be carried over to assess the free speech rights of teachers who are public employees. And, as the Supreme Court and Tenth Circuit have made quite clear, the proper First Amendment doctrine for evaluating a public school teacher's speech is the *Pickering* balancing test.[10]

■ In the end, this Court is unable to discern any distinct First Amendment doctrine that affords heightened protection to academic or "school speech."[11] This means,

---

10. These issues aside, there are other problems with an "academic speech" doctrine, such as defining the "academy" to which it applies (i.e., to elementary schools, high schools, and universities?), and determining where it applies (i.e., in the classroom, the halls, or anywhere on campus?).

11. *Cf.* T. Fischer, *The Law and Education: Supreme Court Doctrine Reaches Critical Mass*, 13 Miss.C.L.Rev. 287 (1993) (discussing many different legal standards that apply to evolving field of "education law"); R. Keiter, *Judicial Review of Student First Amendment Claims*, 50 Mo. L.Rev. 25 (1985) (discussing difficulties of applying First Amendment in school settings); R.

therefore, that in cases involving speech and schools, "the particular type of free speech analysis depends upon the particular relationship between the speaker and the public school." J. Whitehead and A. Crow, *Beyond Establishment Clause Analysis in Public School Situations: The Need to Apply the Public Forum and Tinker Doctrines*, 28 Tulsa L.J. 149, 151 (1992).[12] If anything, the doctrines that most often apply to school speech (i.e., the *Pickering* balancing test, the "time, place, and manner" balancing test, the *Tinker* balancing test, and the public forum doctrine) ultimately may afford students and teachers less protection than they otherwise would enjoy as citizens speaking in traditional public forums.[13]

It is this fact, the Court suspects, that has caused the Supreme Court to champion, in a strictly hortatory manner, the cause of free academic speech. The subtext of the Court's message seems to be that although educators may choose to restrict speech in the schools without violating the letter of the First Amendment, they violate the spirit of the First Amendment when they do so. Although this Court fully agrees, this agreement does not lead to a holding that Westbrook's speech is protected because she may have been speaking about school matters in an academic setting. These are facts that, if proven, go into the *Pickering* balance. The Court will give them whatever added weight

they properly deserve in the context of that balance.

## V. TETON COUNTY'S POLICY AS A TIME, PLACE, AND MANNER RESTRICTION ON SPEECH

 In defense of its policy, Teton County astutely argues that the policy does not actually prohibit speech but only channels it. The district bases its argument in part on the existence of a grievance procedure, and in part on the requirement that employees proffer "criticism" only to certain people (i.e., the "face-to-face requirement"). Teton County apparently sees these speech channels as the sluice through which all "criticism" must flow. Washed of its "alternative means" trappings, this argument reveals itself as an effort to save the policy by invoking "the permissive talisman of 'time, place, or manner' regulation." Tribe, *American Constitutional Law* at 794.

 To sustain a time, place, and manner speech restriction on speech, the government bears the burden of proving that its restriction: (1) is content-neutral; (2) serves a significant governmental interest; (3) is narrowly tailored to serve that interest; and (4) leaves open ample alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989); *City of Watseka v. Illinois Public Action Council*, 796 F.2d 1547, 1551–52 (7th Cir.1986), *aff'd without*

Mawdsley and S. Permuth, *Free Speech and Public Education: An Overview of Legal, Social, and Political Issues*, 16 St. Mary's L.J. 873 (1985) (explaining various ways in which First Amendment applies in school settings).

12. Implicitly agreeing with this general approach, Professor Fish argues for an across the board First Amendment balancing test that, as applied to educational settings, would consider who spoke; what they said; and how, when, and where they said it. Stanley Fish, *There's No Such Thing as Free Speech ... And It's A Good Thing, Too* 126–29 (1994).

13. Indeed, a number of commentators have argued that the highwater mark for student speech rights was *Tinker*, and that the Supreme Court's decisions in *Bethel School District v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1985) (allowing school to punish student for using indecent language) and *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98

L.Ed.2d 592 (1988) (allowing school to control student speech in school newspaper), have resulted in abridged speech rights for students. C.T. Dienes and A. Connolly, *When Students Speak: Judicial Review in the Academic Marketplace*, 7 Yale L. & Pol'y Rev. 343 (1989); W. Hopkins, *Hazelwood v. Kuhlmeier: Sound Constitutional Law, Unsound Pedagogy,* 16 N.Ky.L.Rev. 521 (1989). Some argue these decisions simply reflect the fact that First Amendment values and educational goals are to some degree incompatible. S. Ingber, *Socialization, Indoctrination, or the "Pall of Orthodoxy": Value Training in Public Schools*, 1987 U.Ill.L.Rev. 15, 44. Justice Blackmun frankly recognized this incompatibility, or tension, in *Board of Educ. v. Pico*, 457 U.S. 853, 879, 102 S.Ct. 2799, 2814, 73 L.Ed.2d 435 (1982) (concurring): "the unique environment of the school places substantial limits on the extent to which official decisions may be restrained by First Amendment values."

*opinion,* 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972 (1987). Because these criteria are conjunctive, *see Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. at 954–55, Teton County's policy must satisfy each to pass constitutional muster.

## A. Content–Neutrality

 A speech restriction is content-neutral if it is "justified without reference to the content of the regulated speech." *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); *Virginia Pharmacy Bd.,* 425 U.S. at 771, 96 S.Ct. at 1830. The principal inquiry is whether the government has adopted the restriction "because of [agreement or] disagreement with the message it conveys." *Ward,* 491 U.S. at 791, 109 S.Ct. at 2754. "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based." *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2459.

Although determining whether a regulation is content-based or content-neutral "is not always a simple task," *id.* at ——, 114 S.Ct. at 2459, that is not the case here. Teton County's policy is, on its face, content-based. It restricts an entire class of speech, "criticism," on the basis of content. The fact that Teton County's policy is not view-point based (that is, it does not espouse a particular point of view) does not alter this conclusion.

 Provisions that regulate all speech on a given topic, no matter what position the government takes on that topic, are content-based: "The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion on an entire topic." *Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980); *Chesapeake & Potomac Tel. Co. v. United States,* 42 F.3d 181, 192 n. 18 (4th Cir.1994). Taking note of this fact in *Boos,* 485 U.S. at 319–20, 108 S.Ct. at 1162–63, the Supreme Court held that a picketing ordinance was content-based because its application "de-

pends entirely upon whether … picket signs are critical of" foreign governments. Here, Teton County's policy operates in the same way; its application depends entirely on whether the expression at issue constitutes "criticism."

While this fact alone leads to the conclusion that Teton County's policy is content-based, another fact leads to this conclusion as well: Teton County justifies its policy exclusively by referring to the content of the regulated speech. Teton County asserts, in other words, that its policy is necessary because unfettered "criticism" undermines "the school's mission in maintaining appropriate school discipline and quality staff relations." Teton County further claims that it needs to suppress "criticism" in order to promote "ethical and professional behavior." Because Teton County links "criticism" to a number of presumably noxious effects, it has enacted a policy which requires it to examine the communicative impact of speech and determine whether, based on that impact, the speech fits within a protean category of expression called "criticism." If it does, and the "criticism" did not flow through the prescribed channels, Teton County will discipline the speaker. Teton County's policy is not, therefore, content-neutral.

## B. Significant Government Interest

 As *Pickering* and its progeny unequivocally proclaim, government has a presumptively significant interest in operating effective and efficient schools. In this case, Teton County points not only to this interest, but also to its interest in maintaining order, discipline, civility, professionalism, and ethics. Because "effectiveness" and "efficiency" are broad enough to encompass these other asserted interests, the Court cannot say that these interests are neither significant nor legitimate. Indeed, the Court readily concedes that when the government acts as an employer and educator, it has a legitimate and substantial interest in maintaining order, discipline, civility, professionalism, and ethics. Neither schools nor workplaces function well when these interests are ignored.

## C. Narrow Tailoring

 To satisfy the narrowly tailored requirement, a regulation "need not be the least restrictive or least-intrusive means" of serving the government's interest. *Ward,* 491 U.S. at 798, 109 S.Ct. at 2757. However, a regulation that "burden[s] substantially more speech than is necessary to further the government's legitimate interests" is not "narrowly tailored." *Id.* at 799, 109 S.Ct. at 2758. "[I]f there are numerous and obvious less-burdensome alternatives to the restriction on ... speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 417 n. 13, 113 S.Ct. 1505, 1510 n. 13, 123 L.Ed.2d 99 (1993); *Project 80's, Inc. v. City of Pocatello,* 942 F.2d 635, 638 (9th Cir.1991) (restrictions that disregard less restrictive and more precise means are not narrowly tailored).

To determine whether there is a reasonably narrow fit between the government's chosen means and the government's stated ends, it is helpful to know exactly what the government wants to accomplish. Knowing this, the Court can decide whether the government has narrowly tailored its means to serve its ends.

In this case, identifying Teton County's goals is something like shooting at a large moving target. At various times, Teton County takes its cue from *Pickering* and asserts that the policy serves its interests in running "effective" and "efficient" schools. At other times, Teton County asserts that its policy helps maintain order, prevent disruption, encourage respect, engender professionalism, preserve civility, inculcate ethics, and prohibit defamation. At still other times, Teton County contends that its policy is "a restriction against that type of critical, unprotected speech which may be false and reckless statements within the context of the speech [sic]."

It should immediately be obvious that Teton County would have difficulty drafting any type of speech restriction which serves these broad and ambitious goals. In fact, the Court doubts that any speech code, no matter how broad or comprehensive, could serve all these interests. Despite the fact that the link between speech codes and these goals is attenuated at best (and non-existent at worst), Teton County claims that its 46 word policy accomplishes all these goals without burdening substantially more speech than is necessary to further its interests. Teton County's policy does so (if at all) by cutting an extraordinarily broad swath through both protected and unprotected speech.

Apparently realizing that its policy might be a bit broad, Teton County gives the "narrow tailoring" game away by stating that its policy "was only meant to be a prohibition against unprotected speech." Although this may be true, there is a vast and constitutionally significant difference between intentions and effects. Teton County's intention may have been to draft a policy that prohibited only unprotected speech. As drafted, however, Teton County's policy prohibits much more than unprotected speech. It regulates all "criticism," whether protected or unprotected, aired at any time, in any place, or in any manner. The Court therefore concludes that Teton County's policy burdens substantially more speech than is necessary to further its legitimate interests.

In reaching this conclusion, the Court notes that Teton County has disregarded "far less restrictive and more precise means" for accomplishing its goals. *City of Cincinnati,* 507 U.S. at 417 n. 13, 113 S.Ct. at 1510 n. 13. Given its asserted goals, Teton County might have drafted a policy that specifically prohibits only those relatively few categories of speech that enjoy little or no First Amendment protection. Teton County also could have drafted a policy that regulates speech which is, under the *Pickering* balancing test, nearly always unprotected. By ignoring these less burdensome alternatives to its near blanket ban on "criticism," Teton County has failed to tailor narrowly the policy to serve its interests.

## D. Ample Alternative Channels of Communication

 Valid time, place, and manner speech regulations also must "leave open ample alternative channels for communication of

the information." *Virginia Pharmacy Bd.,* 425 U.S. at 771, 96 S.Ct. at 1830; *Regan,* 468 U.S. at 648, 104 S.Ct. at 3266–67. The alternatives must be "sufficiently similar to the method foreclosed by the regulation." *Chesapeake & Potomac,* 42 F.3d at 203; *see also Providence Journal Co. v. City of Newport,* 665 F.Supp. 107, 118 (D.R.I.1987) (focus is on channels left open in public forum, not alternatives available on private property) (citations omitted). An alternative is not "ample" if it does not allow the speaker to reach his or her "intended audience." *Bay Area Peace Navy v. United States,* 914 F.2d 1224, 1229 (9th Cir.1990) (citations omitted). Alternative modes of communication may be constitutionally inadequate if the speaker's "ability to communicate effectively ·is threatened." *Taxpayers for Vincent,* 466 U.S. at 812, 104 S.Ct. at 2133.

Although the normal course of analysis would be to determine exactly what kind of speech Teton County's policy prohibits, and then to compare the prohibited modes with the alternative modes, the better course in this case is to determine what kind of speech Teton County's policy does not prohibit, and to compare the alternative modes with those that otherwise would be available to Teton County employees.[14] Teton County's policy does not prohibit that "criticism" which is (1) channeled through the formal grievance procedure or (2) delivered face-to-face. In the absence of this policy, Teton County employees would (without fear of retribution) be able to "criticize" at the times, in the places, and in the manners protected by the First Amendment. They also would be able to "criticize" in a way that did not tip the *Pickering* balance toward unprotected speech.

■ Given the many ways in which employees could (consistent with the First Amendment) proffer "criticism", the Court need not linger long over the fact that Teton County has not left open ample alternative methods of communicating "criticism." Teton County's grievance procedure and its face-to-face requirement simply are not sufficiently similar to the other methods of constitutionally protected "criticizing" that its policy forecloses.[15] Lacking even a modicum of such similarity, Teton County's policy threatens its . employees' ability to communicate effectively.

In the end, Teton County's policy not only fails the test for valid time, place, and manner restrictions, it also does violence to the general proposition that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State of New Jersey,* 308 U.S. 147, 163, 60 S.Ct. 146, 151–52, 84 L.Ed. 155 (1939). That essentially is Teton County's plea in this case: its policy may abridge speech in some places but it allows speech in others. The only problem with this plea is that it runs afoul of the First Amendment by abridging speech in most places while allowing it in only a few.

## VI. MOOTNESS

■ Perhaps sensing that its limited criticism policy was a draconian measure squarely at odds with the First Amendment, Teton County rescinded Staff Conduct Policy GBCB on November 30, 1995. In light of this fact, Teton County has filed a motion to dismiss Westbrook's claims for declaratory judgment and injunctive relief because they are now moot.

■ The mere fact that Teton County voluntarily has rescinded its policy does not necessarily mean that Westbrook's motion for injunctive relief is moot. The Supreme Court many times has stated that a "court's power to grant injunctive relief survives discontinuance of the illegal conduct." *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Allee v. Medrano,* · 416 U.S. 802, 810–11, 94 S.Ct.

---

**14.** This is a better course because determining the kinds of speech that Teton County's policy prohibits is an impossible task. It is impossible because the policy prohibits the limitless variety of words and sentences that could be considered "criticism."

**15.** This is not to say that grievance procedures are irrelevant to employee speech. Whether an employee uses the grievance procedure is one of the factors to consider in the context of *Pickering* balancing.

2191, 2197–98, 40 L.Ed.2d 566 (1974) (citations omitted). Were the rule otherwise, defendants in every case involving injunctive relief could cease their illegal conduct, have the case dismissed, and with the specter of judicial intervention gone, "return to [their] old ways." *W.T. Grant Co.*, 345 U.S. at 632, 73 S.Ct. at 897. Recognizing this fact, the Seventh Circuit has explained:

> A voluntary cessation of wrongful conduct may eliminate the need for injunctive relief but does not defeat a court's power to act. The exercise of that power depends on the court's appraisal of all relevant circumstances, including the threat or likelihood of recurring violations. If past wrongs have been proved, and the possibility of future misconduct survives, so does the court's power.

*Atlantic Richfield Co. v. Oil, Chemical and Atomic Workers*, 447 F.2d 945, 947 (7th Cir. 1971) (citations omitted). This Court therefore will exercise its power unless Teton County carries its "heavy burden" of demonstrating that "there is no reasonable expectation that the wrong will be repeated." *W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. at 897; *see also City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n. 10, 102 S.Ct. 1070, 1074 n. 10, 71 L.Ed.2d 152 (1982) (case might become moot if subsequent events make it "absolutely clear" that illegal conduct will not reoccur).

Teton County here attempts to carry its considerable burden with an affidavit which states that the board of trustees met and "unanimously voted to delete Policy GBCB titled 'Staff Conduct'." To verify this fact, Teton County has submitted the relevant school board meeting minutes. These minutes state only that the board unanimously voted to delete the current policy "in conjunction with approval of the new policy." The minutes also indicate that the "new policy" concerning "criticism" is now embedded firmly in the revised grievance procedure.

As is evident from the affidavit and the minutes, the school board has expressed absolutely no doubt about the wisdom of its policy and has never acknowledged that the policy might be unconstitutional. The board's obvious lack of concern becomes more serious when viewed in light of the fact that the board has enacted a new policy which reflects its desire to channel all "criticism" through the grievance procedure.

■■■ Though these facts alone are enough to convince the Court that the school district appears to have rescinded its limited criticism policy in name only, the Court also considers the fact that the rescinded policy was not a recent experiment gone awry. Rather, it is a policy that has been in effect, and presumably enforced, for 15 years. Where, as here, a policy is "deeply rooted and long standing," the Court has a duty to adjudicate the legality of the policy. *Gray v. Sanders*, 372 U.S. 368, 372, 83 S.Ct. 801, 804, 9 L.Ed.2d 821 (1963).

The Court has done so and has found that Teton County's policy transgresses on terrain protected by the First Amendment. Unfortunately, this is not a transgression that can be passed off as mere oversight, sloppy drafting, or an error in judgment. Instead, it is a deliberate transgression that continues to find its defenders. Given this history, the Court can only conclude that Teton County has failed to shoulder its "heavy burden" of demonstrating that "there is no reasonable expectation that the wrong will be repeated." An injunction will issue.

### Conclusion

In the end, the Court notes only that "it would be well if those entrusted to administer the teaching of American history and government began their efforts by practicing the document on which that history and government are based." *Shanley v. Northeast Indep. School Dist.*, 462 F.2d 960, 978 (5th Cir.1972). This history, Justice Brandeis reminds us, is that:

> Those who won our independence believed that the final end of the State was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as

you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction.... Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.

*Whitney v. California*, 274 U.S. 357, 375–76, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). The First Amendment's guarantee of free speech in this case leads to the following **ORDER:**

The Court grants partial summary judgment on Westbrook's Declaratory Judgments Act claim. For the reasons set forth in this order, the Court declares that Teton County School District No. 1 Policy GBCB, paragraphs 1 and 3, are unconstitutional on their face.

The Court permanently enjoins Teton County School District No. 1 from enforcing Policy GBCB, paragraphs 1 and 3. Because the policy is unconstitutional on its face, the Court further enjoins Teton County School District No. 1 from in any way disciplining or punishing any employee pursuant to this policy.

The Court does not enjoin Teton County School District No. 1 from enforcing its new "criticism" policy because that issue is not properly before the Court. The Court expresses no opinion as to that policy's constitutionality, but suggests that the school district assess its new policy in light of this order.

### APPENDIX A

EDUCATIONAL POLICY MANUAL
TETON COUNTY SCHOOL DISTRICT # 1
JACKSON, WYOMING

Approval Date Thursday, April 9, 1981

File Code GBCB

Cross Reference

#### *STAFF CONDUCT*

1. It shall be unethical for any staff member to criticize other staff members, the administrators, or members of the Board of Trustees to anyone other than the person being criticized except to the Building Principal, Superintendent, or at a regular meeting of the Board of Trustees.

2. The Teton County School District Board of Trustees does not condone profanity by school personnel on school premises nor at any school activities. Cooperation of all members of the District is requested in this matter.

3. Continued disregard for this policy will result in disciplinary action.

First Reading: Feb. 26, 1981
Second Reading: April 9, 1981